**AMERICAN FARM BUREAU FEDERATION, Plaintiff,**

v.

**ALABAMA FARMERS FEDERATION, Elect–The Political Action Committee of the Alabama Farmers Federation, Alfa Life Insurance Corp., Alfa Mutual Insurance Co., Alfa Mutual Fire Insurance Co., Alfa Mutual General Insurance Co., Alfa Insurance Corp., and Alfa General Insurance Corp., Defendants.**

Civil Action No. 94–A–1408–N.

United States District Court, M.D. Alabama, Northern Division.

Aug. 22, 1996.

Joseph C. Espy, III, Melton, Espy, Williams & Hayes, P.C., Montgomery, AL, Richard A. Flynt, Alfred N. Goodman, Michael Thomas Murphy, Roylance, Abrams, Berdo & Goodman, Washington, DC, Richard J. Favretto, Marc Gary, Mayer, Brown & Platt, Washington, DC, for American Farm Bureau Federation.

Robert A. Huffaker, Rushton, Stakely, Johnston & Garrett, Montgomery, AL, Donald A. Kaul, Brownstein & Zeidman, P.C., Washington, DC, for Alabama Farmers Federation, Alfa Life Insurance Corporation, Alfa Mutual Insurance Company, Alfa Mutual Fire Insurance Company, Alfa Mutual General Insurance Company, Alfa Insurance Corporation, Alfa General Insurance Corporation, Elect, the Political Action Committee of the Alabama Farmers Federation.

## *MEMORANDUM OPINION*

ALBRITTON, District Judge.

## I. INTRODUCTION

The Plaintiff, American Farm Bureau Federation ("American"), filed this suit on October 31, 1994, against the Alabama Farmers Federation ("AFF"); ELECT, AFF's political action committee; and AFF's insurance affiliates (collectively referred to as the "Alfa Companies"): Alfa Life Insurance Corporation, Alfa Mutual Insurance Company, Alfa Mutual Fire Insurance Company, Alfa Mutual General Insurance Company, Alfa Insurance Corporation, and Alfa General Insurance Corporation. (All of these defendants will be called "Defendants.") American claims that the Defendants made unauthorized use of American's federally registered mark, FARM BUREAU, in violation of a previous settlement agreement between the parties as well as federal and state trademark infringement and unfair competition laws.

The court has jurisdiction by virtue of 28 U.S.C. § 1332 and 28 U.S.C. § 1367 since there is complete diversity of citizenship between the parties and the amount in controversy exceeds $50,000.00, exclusive of interest and costs; and 28 U.S.C. §§ 1331, 1332, 1338(a) and (b), and 15 U.S.C. § 1121 for infringement of a federally registered service mark and for unfair competition.

On November 27, 1995, this court conducted a bench trial on the merits of the case. After consideration of the testimony of the witnesses, the exhibits, and the briefs of the parties, the court makes the following findings of fact and conclusions of law:

## II. FINDINGS OF FACT

### A. The Parties and the Farm Bureau Trademark

#### 1. *American and Its Mark*

American is a nationwide organization representing the economic, social, and educational interests of farmers and ranchers in the United States. From its headquarters in Park Ridge, Illinois, and its legislative advocacy office in Washington, D.C., American represents over 4.5 million member families in all fifty states and Puerto Rico. American promotes the development of agriculture and serves the farm community through public policy advocacy, service to member programs, and numerous other activities.

American provides these services to individual members through state member organizations which, in turn, are comprised of county member organizations. In return, each state member organization pays to American an annual membership fee calculated on a per member basis. Historically, this fee has been an annual $3.50 per member.

American is the undisputed owner of the FARM BUREAU, FARM BUREAU INSURANCE, and AMERICAN FARM BUREAU FEDERATION marks. From its inception in 1919, American has continuously and extensively used the designations FARM BUREAU and AMERICAN FARM BUREAU FEDERATION as American's distinctive marks to identify the organization, its activities, and its services. American registered these marks with the United States Patent and Trademark Office, and these registrations are valid, subsisting, and incontest-

able under Sections 15 and 33(b) of the Trademark Act of 1946, 15 U.S.C. §§ 1065 and 1115(b).[1] American, its state members and their affiliated companies give notice to the public of American's ownership of the mark by using the registration symbol (®) and by other means.

American licenses its state member organizations to use the FARM BUREAU mark. Like American, the state member organizations and their affiliated companies have used and heavily promoted the FARM BUREAU mark since the early 1920's. Virtually all of them incorporate the FARM BUREAU mark in their names, calling themselves the "Georgia Farm Bureau Federation," the "Mississippi Farm Bureau Federation," and so forth.

American and its state Farm Bureau organizations use the FARM BUREAU mark and its variations and abbreviations (such as "FARM BUREAU INSURANCE," "FB," and "AFBF") in numerous ways: in newsletters, brochures, computer services, and magazines; in connection with insurance services; on stationary; in position papers and contacts with government representatives; on building signs; on television and radio; in telephone directories and directory assistance, etc. The more than fifty affiliated insurance companies providing insurance to American's farmer and non-farmer members typically identify themselves through a name that includes the term "Farm Bureau Insurance." As a result of this extensive use, the FARM BUREAU mark has come to identify American and its sponsored state and county organizations along with the services they provide.

## 2. AFF, the Alfa Insurance Companies, and ELECT

Alabama Farmers Federation is the successor, by change of name, to American's original Alabama member organization known as the Alabama Farm Bureau Federa-

tion. Originally chartered in Alabama in 1921, what is now AFF operated as the "Farm Bureau" and extensively promoted the FARM BUREAU mark in Alabama until it withdrew its affiliation with American in 1981. AFF has county affiliates in each of the sixty-seven counties of this state with a total membership of approximately 384,000 people, consisting of roughly 104,000 active members and 280,000 associate members. (Associate members do not derive income from farm-related activities and join AFF primarily to obtain the insurance benefits offered exclusively to AFF members.)

The insurance companies now known as the Alfa Companies were organized in the mid–1940's and 1950's and the decades that followed to provide insurance to Alabama Farm Bureau members. Through overlapping officers and directors, the Alfa Companies and AFF maintain a close relationship and affiliation and are all related companies. For example, the companies are headquartered in the same building, which they jointly own, where they maintain common departments that function for their mutual benefit: the office of General Counsel represents the legal interests of each of the Alfa Companies; the Alfa Companies share a common marketing department and also use a common public relations department; and Creative Consultants, a wholly owned subsidiary of AFF, provides in-house advertising and promotional services to the Alfa Companies and AFF.

AFF, unlike American, has a political action committee, ELECT, that makes political contributions to federal and state candidates throughout the United States. Formerly known as "ELECT–The Political Action Committee of the Alabama Farm Bureau Federation," ELECT changed its name and its bylaws in 1987 to correctly reflect its affiliation with AFF.

---

**1.** American owns United States Collective Mark Registration No. 594,500 for the mark FARM BUREAU; United States Service Mark Registration No. 1,002,111 for the mark AMERICAN FARM BUREAU FEDERATION and Design; United States Service Mark Registration No. 1,465,000 for the mark AMERICAN FARM BUREAU FEDERATION; United States Service

Mark Registration No. 1,603,029 for the mark AMERICAN FARM BUREAU and FB Design; United States Collective Membership Mark Registration No. 1,612,451 for the mark FARM BUREAU; and United States Service Mark Registration No. 1,622,828 for the mark FARM BUREAU INSURANCE.

## B. The History of the Dispute

### 1. *The 1983 Litigation*

In 1981 Alabama Farm Bureau Federation severed its ties with American following a lengthy dispute over the sale of insurance outside the state of Alabama. AFF and its insurance affiliates continued to use the FARM BUREAU mark after ending their affiliation with American, eventually causing American in 1983 to file suit in this court against AFF for trademark infringement. AFF's two insurance affiliates, Alabama Farm Bureau Mutual Casualty Insurance Company, Inc. (now Alfa Mutual Insurance Company) and Alabama Farm Bureau Mutual Insurance Service, Inc. (now Alfa Mutual Fire Insurance Company), intervened. On the eve of trial, following two years of litigation in this court, the parties agreed to a settlement. (AFF, Alfa Mutual Insurance Company, and Alfa Mutual Fire Insurance Company will be referred to collectively as the "Contracting Defendants.")

### 2. *The 1986 Settlement Agreement and Formation of a New Alabama Farm Bureau*

The parties executed the Settlement Agreement on March 20, 1986. It provided that, if AFF (identified in the Settlement Agreement by its former name, "Alabama Farm Bureau Federation") did not reaffiliate with American by the end of 1986, AFF, its two insurance affiliates "and their subsidiaries, affiliates and related companies shall begin to phase out all use of the name 'Farm Bureau' in connection with any and all of their programs, products, services and activities, such phase-out to be completed by December 31, 1989. After December 31, 1989, [these] companies, and their subsidiaries, affiliates and related companies shall not use the name 'Farm Bureau' in any manner, except that [the two insurance companies] shall be entitled to keep their present corporate names in effect for purposes of their corporate charters only until December 31, 1991.... [AFF] shall use its best efforts to persuade all of its member county Farm Bureaus to discontinue use of the term "Farm Bureau" in any manner by December 31, 1989, and it shall deny membership to any county organization that continues to so use that term after December 31, 1989." (Pl.'s Ex. 1, ¶ 6.)

The Settlement Agreement further provided that American was free to organize a new affiliate in Alabama after 1986, but that the name of that affiliate could not include the term FARM BUREAU until 1992. In essence, the Settlement Agreement created a two-year moratorium period from January 1, 1990, to December 31, 1991, during which the Contracting Defendants and their affiliated companies could not use the FARM BUREAU mark at all, and American and its new Alabama state organization could use the mark in Alabama only in limited circumstances.[2]

In 1989, American established a new state member organization in Alabama, the "Alabama Federation of Agricultural Producers." In January of 1992, as permitted by the Settlement Agreement, this new Alabama affiliate changed its name to the Alabama Farm Bureau Federation—a name patterned after other state Farm Bureau organizations.

## C. The Defendants' Uses of the Farm Bureau Mark Following the Settlement Agreement

American complains that AFF ignored its promises in the Settlement Agreement and continued to use the FARM BUREAU mark in several ways. The evidence proves that this is true.

### 1. *The Engraved Headstone on the Defendants' Headquarters Building*

On March 20, 1986—the very day that the parties executed the Settlement Agree-

---

**2.** Unlike the categorical prohibition on AFF's use of the FARM BUREAU name after December 31, 1989, the restrictions on the use of the FARM BUREAU mark by American and its new Alabama affiliate during the 1990–1991 moratorium period included several exceptions. For example, the new Alabama state organization was free to identify itself as being a member of the American Farm Bureau Federation, and American and its subsidiaries or affiliates could provide at any time (including during the moratorium) services, products, programs and activities under the FARM BUREAU mark to its new state organization in Alabama and any of the state organization's county or individual members. (Pl.'s Ex. 1, ¶¶ 8, 9.)

ment—a construction contractor renovating the Defendants' headquarters building placed above the building's front entrance an engraved headstone that read "ALABAMA FARM BUREAU." Seven years later, in 1993, after receiving a complaint from American specifically directed to the headstone, the Defendants covered it with a bronze plaque that reads "Alabama Farmers Federation." Under the terms of the renovation contract, the Defendants could have changed any aspect of the renovation project, including the headstone, until November 15, 1986.

### 2. Telephone Directory Cross–References

On May 1, 1987—well into the "phase-out" period set forth in the Settlement Agreement—an Alfa Marketing Services employee sent a letter to the Alfa Companies' telephone directory placement representative, Berry Network, instructing Berry to "please be sure that our new name 'Alfa Insurance' is cross referenced with Alabama Farm Bureau Insurance and Farm Bureau Insurance in the Yellow and White pages...." (Pl.'s Ex. 65.) As a result of this instruction, cross-references using the FARM BUREAU mark appeared in hundreds of telephone directories published throughout Alabama and parts of Mississippi and Georgia. The cross-references read: "Farm Bureau Insurance—See Alfa Insurance" or "Alabama Farm Bureau Insurance—See Alfa Insurance."

The agreement between the Alfa Companies and Berry Network specified that Berry would continue to place the cross-references previously ordered by the Alfa Companies in all subsequent issues of telephone directories until notified to stop. The Defendants regularly received and paid invoices from Berry Network that clearly showed these cross-references. In spite of the Settlement Agreement's deadline to stop all uses of the FARM BUREAU mark on December 31, 1989, followed by a two-year moratorium on the mark's use in Alabama, the Alfa Companies never attempted to delete the cross-references until April 3, 1992, when, by letter, they instructed Berry Network to cancel the cross-references in Alabama, Georgia and

Mississippi. By that time, however, many 1992–1993 directories had already been published, ensuring public access to the cross-references for another year; in fact, several cross-reference listings persisted beyond 1993 and into 1995.

AFF and its county members also maintained telephone directory listings using the FARM BUREAU mark well past the December 31, 1989, deadline. In February of 1991, Michael Kilgore, AFF's Director of the Department of Organization, observed in a memorandum that "many of the county Federations are still listed in the telephone directory as County Farm Bureau and Farm Bureau Insurance." (Pl.'s Ex. 97.)[3] Also, AFF's subsidiary, Alfa Services, continued to list itself in the Montgomery telephone directory as "Farm Bureau Services, Inc." into 1992.

### 3. Telephone Directory Assistance Cross–References

The Defendants placed cross-references between "Farm Bureau Insurance" and "Alfa Insurance," and "Alabama Farm Bureau Insurance" and "Alfa Insurance," in directory assistance databases throughout Alabama. These cross-references continued in place long after the December 31, 1989, deadline, with some continuing to appear in Alabama as late as October of 1995.

### 4. Two-and-a-Half Million Insurance Brochures

In 1987, the Alfa Companies created new insurance brochures to promote the various Alfa insurance lines. These brochures contained one or more of the following sentences: "Alfa has been insuring families since 1947, when we were founded by the Alabama Farm Bureau;" or "Alfa has been insuring families since 1946, when we were founded by the Alabama Farm Bureau;" or "Alfa was founded by the Alabama Farm Bureau to provide coverage primarily for its farmer members." The brochures failed to state that Alfa was no longer affiliated with Farm Bureau.

**3.** There is no evidence before this court that AFF ever discontinued a county organization's membership, or even threatened to do so, as a result of a county organization's use of the FARM BUREAU mark after the December 31, 1989, deadline.

From 1990 to 1994, long after the promised December 31, 1989, deadline to discontinue use of the "Farm Bureau" name in "any manner," the Defendants distributed approximately 2.5 million of these brochures to potential customers at a cost of about Two–Hundred–Thousand Dollars ($200,000.00), reordering and republishing the brochures more than fifty-five times. Gordon Carter, an attorney in the Defendants' legal department, and Ken Wallis, the Alfa Companies' General Counsel, reviewed these brochures and approved them at various times. Wallis approved the brochures and their use even after becoming aware of American's complaints concerning the Defendants' uses of the FARM BUREAU mark in violation of the Settlement Agreement.

### 5. Television and Radio Commercials and Other Advertising

On May 1, 1987, Creative Consultants, the Defendants' internal advertising agency, began an intensive ninety-day advertising campaign to introduce the insurance companies' new name, "Alfa," to the public. The advertising theme centered around the statement, "A new name for an old friend, Alfa," and was placed on four television commercials, approximately six radio commercials, on billboards and in newspapers. The commercials ran on approximately a hundred radio stations, twenty television stations, and in approximately a hundred newspapers, saturating the entire state with the advertising theme.

The television advertising alone geographically covered the entire state of Alabama and parts of Mississippi and Georgia. The following conversation between parents and their child from one of the four television commercials exemplifies the message of the television and radio ads broadcast throughout the geographic region:

"I want to change my name."

"Gee, I kind of like Tommy."

"When Farm Bureau Insurance changed its name the only thing that changed was the name."

"We were thinking of something a little more dramatic."

"At Alfa Insurance you will get the same low rates and same great service you always have."

"Okay. Let's hear it, Tom."

"Tomiseno the Terrible."

"How about Tomiseno the Terrific?"

"A new name for an old friend, Alfa."
(Def.'s Ex. 106.)

In March and April of 1995—during the very pendency of this lawsuit—Creative Consulting ran a television commercial that used the FARM BUREAU mark on WSFA–TV. The commercial, designed to commemorate WSFA's fortieth year in business, begins by explaining that when WSFA first came on the air, Alfa Insurance was known by another name. The commercial's video then leads into a nostalgic scene from one of the first Farm Bureau Insurance commercials aired on WSFA–TV: a young girl answering the door and exclaiming, "Momma, it's the Farm Bureau man!" Following this scene, the narrator adds, "Throughout the years, WSFA has been a partner to our continued growth and progress.... And WSFA was there when we changed our name to 'Alfa Insurance.'" (Pl.'s Ex. 91.) Simultaneous with the "changed our name" language, the video shows a man placing an "Alfa Insurance" bumper sticker over a Farm Bureau bumper sticker already on his car's bumper. The commercial fails to mention that Alfa no longer affiliates with American or any other Farm Bureau organization. Ken Wallis, the Alfa Companies' General Counsel, approved the commercial's content before airing it.

WSFA–TV showed the commercial more than fifty-five times, covering a large portion of Alabama and parts of Georgia and Florida, and creating more than 875,000 commercial impressions.[4] As part of a special anniversary offer to its long-time advertising customers, WSFA–TV aired the commercial for an amount of time valued at Seven–Thousand–Four–Hundred–Thirty Dollars ($7,430.00) in

---

4. A "commercial impression" is created each time a member of a television audience views a

commercial.

exchange for the Alfa Companies' agreement to purchase only Four–Thousand Dollars ($4,000.00) more advertising than they had purchased the previous quarter.

### 6. ELECT'S "Farm Bureau" Listing at the Federal Election Commission

Federal law requires ELECT to register and file periodic reports with the Federal Election Commission ("FEC"). Based on these reports, the FEC generates publicly available summaries of information concerning ELECT and other political action committees. Such information includes controlling organizations, amounts of money raised during election cycles, amounts of cash on hand and contributed to various candidates, etc. The FEC indexes these summaries by the name of the political action committee and makes the summaries available to journalists, politicians, and the public at large.

On May 21, 1978, ELECT registered with the FEC as "ELECT—The Political Action Committee of the Alabama Farm Bureau Federation." When the name of ELECT's sponsoring organization changed in 1987 to the "Alabama Farmers Federation," ELECT failed to correct its FEC listing to delete the reference to "Farm Bureau."

### D. American's Complaints Regarding Defendants' Use of the FARM BUREAU Mark After the Settlement Agreement and the Defendants' Response

On May 22, 1992, American's counsel sent a letter to the Defendants' attorney demanding that the Defendants comply with the Settlement Agreement and stop all uses of the FARM BUREAU mark. The letter indicated that American had received reports that Alfa insurance agents and county organizations continued to use the FARM BUREAU mark; attached to the letter were copies of 119 telephone directory listings from Alabama and Georgia containing references to "Farm Bureau." In view of these uses, the letter demanded that "ALFA comply with the terms of the settlement agreement by immediately terminating all use of the 'Farm Bureau' name, by ensuring that all of its subsidiaries, affiliates and related companies cease all use of the "Farm Bureau"

name, and by denying membership to any of its county organizations continuing to use the 'Farm Bureau' name...." (Pl.'s Ex. 18.) The letter concluded by asking for an early reply, "including a description of the affirmative steps ALFA is taking to eliminate all use of the "Farm Bureau" name." *Id.*

In their counsel's reply letter of June 25, 1992, Defendants dismissed the cross-references as simply "vestig[i]al uses," (Pl.'s Ex. 19), and assured American that the Defendants had "taken all steps necessary to completely phase out use of the term 'Farm Bureau' and that such steps had been undertaken well prior to receipt" of American's letter. (Pl.'s Ex. 21). In fact, steps to delete telephone cross-references had not begun until April of that year. Far from being "vestigial uses," these cross-references had actually been initiated as a new use of the "Farm Bureau" name during the period when the Defendants had promised to phase out their use of the name. In what would become their standard response, Defendants addressed only the specific violation listed by American—the cross-references—and thus failed to discover (or acknowledge) the contemporaneous multitude of uses of the FARM BUREAU mark outlined above (i.e., the headstone, millions of brochures, directory assistance listings, etc.).

In spite of the Defendants' assurances that they had phased out all use of the FARM BUREAU mark, American continued its own investigation to ensure that the Defendants had discontinued all use of the mark. In the months that followed, American uncovered additional uses by the Defendants: more telephone listings cross-referencing Farm Bureau Insurance and Alfa Insurance appeared in newly published telephone directories in Alabama and Georgia; two corporations affiliated with the Alfa organization continued to retain the words "Farm Bureau" in their corporate names; and at the Alfa headquarters building, the words "ALABAMA FARM BUREAU" remained etched into stone above the front entrance.

Once again, on December 18, 1992, American sent a letter to the Defendants' counsel informing him of the newly discovered uses of the FARM BUREAU mark. American complained that the telephone listings "have

one purpose and one purpose only—to mislead the consuming public into believing that ALFA insurance products are sanctioned, authorized, and offered for sale by a state entity affiliated with [American]." (Pl.'s Ex. 23.) The letter then repeated the demand that Defendants comply with their obligations under the Settlement Agreement by conducting a thorough investigation throughout the Alfa organizations to uncover and eradicate continuing uses of the FARM BUREAU mark. On December 22, 1992, Dean Kleckner, American's President, went so far as to write a personal letter to Goodwin Myrick, AFF's President and Chief Executive Officer, pleading on a personal level for the two presidents to work together and accomplish a speedy and cooperative resolution without the necessity of litigation.

On January 6, 1993, as a result of the ongoing complaints by American, Tommy Wright, an Alfa marketing executive, sent a memorandum to many Alfa employees that read in part as follows:

> Should anyone by telephone or in person ask for "Farm Bureau" or ask if our company is or was "Farm Bureau", "Farm Bureau Insurance" or ask if we sell "Farm Bureau Insurance" the response should be "this is Alfa Insurance—at one time we were Farm Bureau but we changed our name to Alfa several years ago and we are not affiliated with Farm Bureau."

(Attach. to Pl.'s Ex. 26.)

On January 8, 1993, the Defendants replied by letter to American's second demand letter and followed the pattern established by their earlier correspondence. First, Defendants trivialized the violations, calling them "isolated uses." (Pl.'s Ex. 26 at 1.) Then, they narrowly addressed the specific problems raised in American's letter, but turned a deaf ear to American's insistence that they take broader remedial efforts, such as contacting the telephone companies regarding directory assistance and implementing an internal investigation. In Defendants' words, they "[did] not believe that it [was] necessary or appropriate to undertake any 'thorough

investigation of its entire organization,' as [American] request[ed]." (*Id.* at 5.) Finally, Defendants repeated their earlier assurances that they had "taken all steps necessary to remove any vestiges of use of the term 'Farm Bureau'" and would act promptly if American or the Alfa organization became aware of any such uses. (*Id.* at 5.) The evidence at trial proved that, at the time of these assurances, Defendants knew of other uses of FARM BUREAU (e.g., the promotional brochures) and had no intention of disclosing those uses or eliminating them.[5]

The correspondence between American and the Defendants continued through mid-1993 and so did the Defendants' pattern response. In their letter of April 8, 1993, Defendants referred to the violations as "residual but minor" uses; they continued to resist the notion of implementing an internal investigation; and they repeated their assurances that they "know of no continuing use of the term 'Farm Bureau' at the present time" and that "all past use of the 'Farm Bureau' name has been discontinued." (Pl.Ex. 28 at 3.) Simultaneous with their distribution of insurance brochures making use of the FARM BUREAU mark (a use that Defendants would never voluntarily disclose to American), the Defendants assured American that "we have been completely cooperative with you in voluntarily discontinuing every instance of use of the term 'Farm Bureau,'" (Pl.'s Ex. 30 at 2), and that "there is no plan to again commence use of the "Farm Bureau" name." The Defendants would later, after this lawsuit was filed, create and run the WSFA–TV commercial that used the exclamation, "Mamma, it's the Farm Bureau man!" and flashed to a car bearing the Farm Bureau bumper sticker.

## E. Evidence of Actual Confusion Concerning the Interrelationship Between Alfa and Farm Bureau

### 1. *Direct Testimonial and Documentary Evidence of Actual Confusion*

The new Alabama Farm Bureau continues to receive misdirected telephone calls at-

---

5. Ken Wallis, the Alfa Companies' General Counsel, testified that he knew about, and approved of, the representations being made in the letters between the parties' attorneys while simultaneously being aware that sales brochures containing the FARM BUREAU mark were being printed and distributed to prospective insurance customers throughout Alabama, Georgia, and Mississippi.

tempting to reach Alfa and checks made payable to Alfa; the Alabama Farm Bureau has been incorrectly identified as "Alfa of Farm Bureau" and the "Alabama Farmers Federation" on theater welcome signs and local news broadcasts; and candidates have solicited and received contributions from ELECT while mistakenly associating it with FARM BUREAU because of ELECT's incorrect FEC listing.

### 2. *The Survey Evidence*

At trial, the parties presented two competing surveys of the level of confusion in Alabama concerning the relationship between Alfa and Farm Bureau. American relies primarily on a survey commissioned by the Alfa Companies in April of 1992 and conducted by Dr. Verne Kennedy. Dr. Kennedy's research focused on three groups of Alabamians: (i) non-AFF members; (ii) AFF associate (non-farmer) members; and (iii) AFF active (farmer) members. American focuses on the AFF members' answers to this survey.

Dr. Kennedy asked AFF members the following questions: "Are you a member of one or more farm organizations? (If yes, ask ...) Which organizations do you belong to?" Sixty-four percent (64%) of the Associate members responded that they were not a member of a farm organization, 4.7% claimed to be AFF members, 15.7% claimed to be members of a farm organization containing the "ALFA Name," and 12.7% incorrectly claimed to be members of the Alabama Farm Bureau. Approximately 38% of the farm members responded that they were not members of a farm organization, 13.3% claimed to be AFF members, 22% claimed to be "ALFA Name" members, and 25.3% incorrectly claimed to be members of the Alabama Farm Bureau.

Two final questions in the Kennedy survey asked AFF members about differences between the AFF and the Alabama Farm Bureau. One question asked: "Some people taking part in this survey were not aware that the Alabama Farmers Federation and Alabama Farm Bureau were not the same organization. Before participating in this survey, did you think they were the same or different?" A significant portion of the asso-

ciate members (16.7%) and the farm members (22.3%) said the organizations were the same. For the respondents answering *different* (63% of the associate members and 62% of the farm members), interviewers asked: "How would you describe the difference between the Alabama Farmers Federation and the Alabama Farm Bureau?" A significant portion of the members (18% of the associate members and 17.7% of the farm members) who previously answered *different* thought the difference centered on insurance—even though the new Alabama Farm Bureau offered no insurance at the time of the survey. Dr. Kennedy concluded that "[s]urvey results indicate high levels of confusion concerning the Alabama Farmers Federation and the Alabama Farm Bureau." (Pl.'s Ex. 48A at 20.)

Dr. Kennedy's survey also demonstrated that the Alabama Farm Bureau enjoyed significant popularity. When asked whether they had a "favorable or unfavorable" opinion of the AFF and Alabama Farm Bureau, 40.6% of associate members and 45% of farm members held a favorable opinion of AFF, while 58.3% of associate members and 62% of Farm members held a favorable opinion of the Alabama Farm Bureau. When asked which name they liked best, more than four times the number of AFF associate members (63.3% to 14.7%) preferred the Farm Bureau name to AFF, and more than three times the number of AFF farm members (57.7% to 18.3%) preferred the Farm Bureau name to AFF.

In anticipation of American's lawsuit, the Defendants in October of 1995 commissioned Dr. Jim Kitchens to survey Alabamians' confusion concerning the affiliation or relationship between Alfa and Farm Bureau. His survey represented with 95% confidence the opinion of every citizen of Alabama over the age of eighteen. Dr. Kitchens's survey revealed that 81% of Alabamians had heard of Farm Bureau before—65% of residents between the ages of 18 and 34, and 91% of residents over the age of 65—but only 2% of Alabamians believed that Alfa and Farm Bureau share a connection or affiliation. However, the survey implied at least the existence of significant confusion among some

Alabamians concerning the identity of their insurance carrier: approximately 249,602 Alabamians [6] indicated that they were aware of "Farm Bureau" because they "ha[d] insurance with them." (Defs.' Ex. 322 at 8.) In contrast to these perceptions, only approximately 11,300 Alabamians actually had Farm Bureau insurance at the time of the survey.

## III. CONCLUSIONS OF LAW

### A. Liability

American and the Defendants agree that, in assessing liability, the court need only consider the Lanham Act and breach of contract counts: the remaining counts share the standard of liability found in the Lanham Act. Furthermore, as explained under the section of this opinion relating to damages, these two counts provide American with its full measure of relief. For these reasons, the court addresses only the breach of contract and Lanham Act claims.

#### 1. *The Breach of the Settlement Agreement*

The parties predictably choose to interpret the Settlement Agreement differently. American argues that the Settlement Agreement's plain meaning is clear: beginning on January 1, 1987, the Defendants had three years (until December 31, 1989) to eradicate all use of the FARM BUREAU mark by the Defendants, after which any use of the mark would constitute a breach of the Settlement Agreement. The Defendants respond that such an interpretation leads to "absurd" results such as prohibiting them from maintaining old historical records containing the FARM BUREAU mark. The Defendants therefore present what they consider a more "reasonable" interpretation that would allow them to use the FARM BUREAU mark "in an historical context in ways which are not designed to confuse or mislead the public." Adopting this interpretation, Defendants argue that they never breached the Settlement Agreement. The court disagrees.

In interpreting a contract, the words of the agreement must be given their ordinary meaning. *Reeves Cedarhurst Dev. Corp. v. First Amfed Corp.*, 607 So.2d 184, 186 (Ala.1992). The agreement must be construed in its entirety, and a single provision or sentence must be considered in the context of others having reference to the same subject matter. *See Yu v. Stephens*, 591 So.2d 858, 859 (Ala.1991). The contract is unambiguous if only one reasonable meaning emerges, *Wayne J. Griffin Elec., Inc. v. Dunn Constr. Co.*, 622 So.2d 314, 317 (Ala. 1993), and the fact that parties allege different constructions of an agreement does not necessarily establish its ambiguity. *Yu*, 591 So.2d at 859–60. Furthermore, "[w]here a contract is unambiguous and plain in expression, ... no canon of construction ... warrants an interpretation the only effect of which is to relieve a party to the contract from consequences deemed by him hard or unfair. Where the parties express without ambiguity their intention, no court can alter the agreement and no room for judicial construction is left." *Lilley v. Gonzales*, 417 So.2d 161, 163 (Ala.1982). A court should strive, however, to accord the contract a reasonable construction as far as the language will permit. *U.S.F. & G. v. Jacksonville State Univ.*, 357 So.2d 952 (Ala.1978).

The court finds that the Settlement Agreement's prohibitions, as applied to this case, are clear. The relevant language reads as follows:

> In the event that [AFF] does not reaffiliate with AMERICAN by December 31, 1986, then [AFF] and [Alfa Mutual Insurance Company and Alfa Mutual Fire Insurance Company] and their subsidiaries, affiliates and related companies shall begin to phase out all use of the name "Farm Bureau" in connection with any and all of their programs, products, services and activities, such phase-out to be completed by December 31, 1989. After December 31, 1989, [AFF, Alfa Mutual Insurance Company and Alfa Mutual Fire Insurance Compa-

---

6. The survey showed that 73% of the approximately 4,274,000 people in Alabama knew of Farm Bureau because of the insurance business. Of these, 8%, or approximately 249,602 Alabami-

ans, indicated they were aware of "Farm Bureau" because they "ha[d] insurance with them." (Defs.' Ex. 322 at 8.)

ny], and their subsidiaries, affiliates and related companies shall not use the name "Farm Bureau" in any manner, except that [Alfa Mutual Insurance Company and Alfa Mutual Fire Insurance Company] shall be entitled to keep their present corporate names in effect for purposes of their corporate charters only until December 31, 1991. (Pl.'s Ex. 1 at ¶ 6.) Webster's defines the verb "use" as "to put into service," "utilize" or "employ" and the noun "use" as "[t]he act or practice of employing something." Webster's Ninth New Collegiate Dictionary 1299 (1991). The court finds these definitions in accord with the word's ordinary meaning. Thus, the Settlement Agreement delineates the Defendants' right to "utilize" the FARM BUREAU mark after December 31, 1986.

First, the Settlement Agreement requires the Defendants to begin, as of January 1, 1987, to "phase out" utilization of the FARM BUREAU mark "in connection with" their programs, products, services and activities. Webster's defines "phase out" to mean "to discontinue the ... use of by phases," *id.* at 881, and "connection" to mean, among other things, "link" or "relationship." *Id.* at 278. The court finds these definitions in accord with the words' ordinary meanings as used in the Settlement Agreement. Thus, the Settlement Agreement requires that, on January 1, 1987, the Defendants begin eliminating the various ways they link the FARM BUREAU mark to their programs, products, services and activities, and gives them three years to complete the process.

Following the three year "phase-out" period, the Settlement Agreement prohibits Defendants from utilizing the FARM BUREAU mark, not just in a manner linked to their programs, products, services and activities, but in "any manner" (with one exception). The Defendants invoke the *in pari materia*

doctrine to argue that only those "uses" previously required to be "phased out," i.e., those uses designed to link the Defendants' programs, products, services and activities with "Farm Bureau," are prohibited after December 31, 1989. But such an interpretation renders the clause prohibiting a use "in any manner" superfluous (since the "phase-out" of these other "uses" had to be "completed" in three years anyway), precisely the result the *in pari materia* doctrine seeks to avoid.

Thus, after December 31, 1989, the "in any manner" language prohibits "uses" in addition to those linking "Farm Bureau" to Defendants. The court therefore concludes that the "in any manner" language prohibits Defendants from either directly or indirectly placing the mark in the public view, whether or not confusion is likely to result.[7] This interpretation fits neatly within the language and preserves the necessity of the explicit corporate charter exception: corporate charters must be filed with the state and are available to the public; therefore, maintenance of charters containing the FARM BUREAU mark would breach the Settlement Agreement without the exception allowing their use. And no matter how "reasonable" this interpretation appears to the Defendants, "[i]t is not the province of the court to make contracts for the parties, but its duty is confined to the interpretation of the one which they have made for themselves without regard to its wisdom or folly." *Scherf v. Renfroe,* 266 Ala. 35, 93 So.2d 402 (Ala.1957). This court refuses to rewrite the clear language of an agreement negotiated by able counsel on both sides in settlement of litigation.

■ The Defendants breached the Settlement Agreement in a multitude of ways.[8] The headstone, telephone directory cross-ref-

---

7. Because American complains today only of "public" uses of the mark, the court need not decide whether internal, nonpublic uses of the mark breach the Settlement Agreement.

8. The Contracting Defendants promised for themselves and their "related companies" in the Settlement Agreement. AFF and the Alfa Companies are "related companies" within the meaning of the Settlement Agreement. In addition,

ELECT is "related" to AFF. Thus, the Contracting Defendants are jointly and severally liable for any prohibited use of the FARM BUREAU mark by themselves or any of the Alfa Companies. In addition, AFF is liable for any prohibited use of the mark by ELECT. Rather than attempt to maintain this distinction throughout the opinion, the court will simply refer loosely to the Defendants' breaches with the understanding that only the Contracting Defendants are liable in damages for breaches of the Settlement Agreement.

erences, directory assistance cross-references, insurance brochures, FEC listing, and WSFA–TV commercial breached the Settlement Agreement by placing the FARM BUREAU mark into public view after December 31, 1989. In addition, some of these and other uses of the mark breached the Settlement Agreement prior to December 31, 1989, because they constituted new uses "in connection with" "programs, products, services and activities" at a time when the Defendants were obligated to discontinue or "phase out" these uses: the telephone directory listings and directory assistance listings, newly implemented in 1987, used "Farm Bureau" to direct callers looking for insurance to Alfa; the brochures, first created and distributed in 1987, used "Farm Bureau" in connection with insurance advertising; and the ninety-day advertising campaign, first implemented in 1987, used "Farm Bureau" and simultaneously promoted insurance.

Therefore, the court finds that the Contracting Defendants are liable to American on American's claim for breach of contract.

### 2. Trademark Infringement

The Lanham Act, 15 U.S.C. § 1051 et seq., provides that no person shall, without consent of the registrant, use in commerce any trademark if "such use is likely to cause confusion, or to cause mistake or to deceive." Id. at § 1114(1)(a). American's FARM BUREAU mark is registered and incontestable; American complains only of the mark's use in commerce; and the court has already found that the Defendants' uses of the mark breached the Settlement Agreement and thus were unauthorized. Therefore, in addition to breaching the Settlement Agreement, Defendants committed trademark infringement as prohibited by the Lanham Act each time they used the FARM BUREAU mark in a manner "likely to cause confusion."

■ The "confusion" giving rise to a Lanham Act violation may take different forms. Ordinarily, trademark infringement cases are

based on the complaint that the defendant employed a trademark so similar to the plaintiff's that the public will mistake the defendant's products for the plaintiff's products. Trademarks, however, are valuable not only as indicators of source, but also as indicators of sponsorship:

> The consumer expects, and deserves to get, the same level of quality under identical marks, no matter what the physical source of the products or services he buys. This then is an example of the "quality" function of trademarks which permits marks to be licensed with control from the licensor over the quality of products and services provided by the licensee.

3 McCarthy on Trademarks § 3–18 at (3d ed.) Thus, a trademark's value as an indicator of sponsorship correlates to the public's trust in the sponsor's personal guarantee of quality.[9] For this reason, "[t]he unauthorized use of a trademark which has the effect of misleading the public to believe that the user is sponsored or approved by the registrant can constitute infringement." *Burger King Corp. v. Mason*, 710 F.2d 1480, 1491–92 (11th Cir.1983). The rule assures that "[t]he quality [and value] of a [registrant's mark] lie within his own control." *Professional Golfers Ass'n of America v. Bankers Life & Casualty Co.*, 514 F.2d 665, 670 (5th Cir. 1975). Even if a defendant's product rivals or exceeds the quality of a registrant's product, the unauthorized product is still trademark infringement because it deprives the registrant of its ability to shape the contours of its reputation. *Caterpillar, Inc. v. Nationwide Equipment*, 877 F.Supp. 611 (M.D.Fla.1994).

■ Former licensees pose a particularly troublesome source of confusion in this regard: "[a] licensee who once had authorization becomes associated in the public mind with the licensor ...," *McCarthy on Trademarks*, § 25.07[1], at 25–48.2, yet the licensor no longer controls and assures the quality of the licensee's product. The obvious dangers

---

**9.** The court uses the term "sponsorship" loosely. The consumer may know only the mark and not the name of the sponsor, if the two are different. Nevertheless, the consumer who relies on the mark for assurance of quality relies on the "sponsorship" of the mark's owner. The con-

sumer cares only that the mark reliably indicated a particular level of quality in the past and therefore continues to do so in the present. Implicitly, then, the consumer relies on the continuing quality control, or "sponsorship," of the mark's owner.

are (1) the public will continue to rely on an assurance of quality that no longer exists, and (2) the public will associate low quality with the licensor's mark when in fact the licensor had nothing to do with the product's quality. To protect consumers as well as the licensor's property interest, the Eleventh Circuit holds that "[a] former licensee cannot mislead the public into believing that its affiliation continues once the licensing arrangement has ceased.... For once the contract ends a licensee's right to the mark ends, and any subsequent use constitutes infringement." *Professional Golfers Ass'n*, 514 F.2d at 670. This court must therefore determine whether the Defendants' uses of the FARM BUREAU mark created the false impression that they remained affiliated with American. If so, these uses constitute trademark infringement. The evidence clearly established several such infringing uses.

### a. *The Engraved Headstone*

The headstone, erected on the day the Defendants signed the Settlement Agreement, remained above the front entrance to the headquarters building long after the Agreement called for its removal. Any person entering the building through its front entrance could look up and see "ALABAMA FARM BUREAU." In common experience, a sign above the front entrance to a building usually identifies the building's occupant. The court therefore finds that the headstone suggests at least an affiliation with Farm Bureau that no longer exists. This use of the FARM BUREAU mark constitutes trademark infringement.

### b. *The Telephone Directory and Directory Assistance Cross-references*

These cross-references commonly read, "Farm Bureau Insurance—See Alfa Insurance." The court finds that these cross-references falsely indicate that Alfa Insurance is in some way connected with Farm Bureau. These uses of the FARM BUREAU mark therefore constitute trademark infringement.

### c. *The Insurance Brochures*

These brochures indicate that Alfa was founded by the Alabama Farm Bureau without mentioning that the two are no longer affiliated. In common experience, an organization that establishes another commonly shares some connection or affiliation with the other. The brochures falsely imply that the Alabama Farm Bureau, as founder of Alfa, sponsors Alfa. The brochures therefore infringe on American's rights in the FARM BUREAU mark.

### d. *Television and Radio Commercials*

The ninety-day advertising campaign in 1987 advertised the theme, "A new name for an old friend, Alfa." Many of these commercials emphasized that "[w]hen Farm Bureau Insurance changed its name the only thing that changed was the name." This statement is patently false: very significantly, when Farm Bureau Insurance changed its name, it also changed its sponsor. Unlike other Farm Bureau's around the country, Alfa no longer had any affiliation with American, a widely known and highly respected nationwide federation of farmers' organizations and the owner of the FARM BUREAU mark. The commercials therefore falsely implied that the longstanding relationship between these insurance companies and "Farm Bureau" and American continued after the name change. This use of the FARM BUREAU mark constitutes trademark infringement.

The WSFA–TV commercial also implies that Alfa remains the same as it was when WSFA–TV first came on the air, except that Alfa was then called "Farm Bureau." Of course, Alfa is not the same, because it no longer licenses the FARM BUREAU mark from American, which therefore no longer assures the quality of Alfa's product. The commercial therefore constitutes trademark infringement.

### e. *ELECT's Listing with the Federal Election Commission*

The listing made available to the public read, "ELECT—The Political Action Committee of the Alabama Farm Bureau Federation." The listing obviously creates the false

impression of affiliation between ELECT and Farm Bureau and constitutes trademark infringement.

■ In addition to the reasons outlined above, the court finds that AFF and the Alfa Companies intended to benefit from confusion regarding their continuing affiliation with Farm Bureau and American.[10] A likelihood of confusion can be found as a matter of law if the defendant intended to derive benefit from the plaintiff's trademark. *Babbit Electronics, Inc. v. Dynascan Corp.*, 38 F.3d 1161, 1179 (11th Cir.1994).

From the very moment they disaffiliated from American, AFF and the Alfa Companies made perfectly clear their intention to unilaterally determine when and how they would use the FARM BUREAU mark in Alabama. They regarded their obligations under the Settlement Agreement with indifference and continued to use the FARM BUREAU mark during the phase-out period and beyond; knew of existing infringing uses yet did nothing to correct them until American actually discovered them and complained, all the while assuring American that no further unauthorized uses existed; trivialized American's complaints regarding breaches of the Settlement Agreement and infringements of the mark; and continued, with the approval of counsel, to advertise the mark without mentioning the disaffiliation, knowing full well the misleading result. They obviously intended, for example, to benefit from the receipt of calls at Alfa by prospective insurance customers who had found Farm Bureau Insurance in telephone directories.

10. The court finds that ELECT's FEC listing was not intentional, but merely an oversight. The failure of AFF to notice and discontinue this use before it was discovered by American is, however, evidence of AFF's lack of diligence in trying to detect and discontinue all infringing uses of the mark.

11. The court gives little weight to Dr. Kitchens's survey of Alabama residents over the age of eighteen. To determine if the Defendants were publishing a confusing message, the ideal population to survey would be those who in fact heard the message. Only those who actually heard the allegedly confusing message could be confused by that message. In the population of Alabama,

■ Finally, the court notes that American presented significant anecdotal and survey evidence of actual confusion among AFF and Alfa customers regarding their affiliation with Farm Bureau.[11] Actual confusion by a few customers is the best evidence of likelihood of confusion by many customers. *Freedom Savings & Loan v. Way*, 757 F.2d 1176, 1185 (11th Cir.1985). Thus, for all of these reasons, the court finds that Defendants' uses of the FARM BUREAU mark were likely to confuse many into believing a continuing affiliation existed between Defendants and Farm Bureau. These uses therefore constituted trademark infringement,[12] and the Defendants are liable to American on that claim.

Having found that the Defendants are liable on both the claim of breach of contract and the claim of trademark infringement, the court will turn to American's claims for relief.

## B. Relief

### 1. *Monetary Award Under the Lanham Act:*

■ The damages provision of the Lanham Act stipulates:

When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office ... shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled, subject to the provisions of sections 1111 and 1114 of this title, and subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs

many may not have heard the allegedly misleading uses of the FARM BUREAU mark. A survey of this population should therefore yield relatively low percentages of confused persons. On the other hand, actual Alfa customers probably have either seen or heard many of the allegedly infringing uses, and therefore the court affords greater probative weight to surveys of this population.

12. The court has applied the six factor test for determining a likelihood of confusion set out in *Dieter v. B & H Industries of Southwest Fla., Inc.*, 880 F.2d 322, 326 (11th Cir.1989). The factors point toward a finding of infringement with respect to each use described above.

of the action. The court shall assess such profits and damages or cause the same to be assessed under its direction. In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed. In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount. If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty. The court in exceptional cases may award reasonable attorney fees to the prevailing party.

15 U.S.C.A. § 1117 (West Supp.1996). This recovery is cumulative, that is, the court may award the registrant both its damages and the infringer's profits. *Babbit Electronics, Inc. v. Dynascan Corp.,* 38 F.3d 1161, 1182 (11th Cir.1994). The statute vests considerable discretion in the district court, *Burger King Corp. v. Mason,* 710 F.2d 1480, 1495 (11th Cir.1983), and "no hard and fast rules dictate the form or quantum of relief." *Id.* at 1495 n. 11.

American contends that Defendants owe a reasonable royalty for their misuse of the FARM BUREAU mark along with an amount for corrective advertising to dispel the resulting confusion. American also seeks Defendants profits and an award of attorney fees. Finally, American seeks a trebling of the entire damage award along with punitive damages under the common law infringement claim. The court begins by assessing American's entitlement to a reasonable royalty.

a. *Reasonable Royalty Damages*

■■■■ The former Fifth Circuit ruled in *Boston Professional Hockey Ass'n v. Dallas Cap Mfg.,* 597 F.2d 71 (5th Cir.1979),[13] that

royalties normally received for the use of a mark are the proper measure of damages for misuse of the mark. The reasonable royalty measure recognizes that, separate from the more traditional damages such as lost sales or declining reputation, trademark infringement deprives the mark's owner of the economic benefit of controlling and licensing the right to use the mark. *See id* at 75. Accordingly, the valuation of a reasonable royalty has been described as follows:

> To adopt a reasonable royalty as the measure of damages is to adopt and interpret, as well as may be, the fiction that a license was to be granted at the time of beginning the infringement, and then to determine what the license price should have been. In effect, the court assumes the existence *ab initio* of, and declares the equitable terms of, a suppositious license, and does this *nunc pro tunc;* it creates and applies retrospectively a compulsory license. . . .

*Univ. Computing Co. v. Lykes–Youngstown Corp.,* 504 F.2d 518, 537 (5th Cir.1974) (quoting *Egry Register Co. v. Standard Register Co.,* 23 F.2d 438 (6th Cir.1928). The license price is "the actual value of what has been appropriated," *id.* at 537 (quoting *Vitro Corp. of America v. Hall Chemical Co.,* 292 F.2d 678, 683 (6th Cir.1961)), and "[w]hen this is not subject to exact measurement, a reasonable estimate of value is used." *Id.*

■■■■ American used this "hypothetical license" approach at trial to determine a reasonable royalty, and the court agrees with this approach and adopts it here. Historically, each year Defendants paid to American $3.50 per member for the benefits of affiliation, which included the use of the FARM BUREAU mark. This figure exceeds the per member value of using the mark for at least two reasons: (1) a portion of the figure can be apportioned to cover administrative membership expenses, and (2) the remaining amount represents, not simply the value of the mark, but the value of all the services and products American provides to its affiliated members. Thus, multiplying the full

---

**13.** In *Bonner v. City of Prichard, Ala.,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

$3.50 figure times the number of AFF members during the infringing period would overvalue the mark. American provides an alternative methodology to determine a more reasonable estimate of the mark's value.

Looking to the data from the 1992 Kennedy survey, American notes that 12.7% of AFF associate members and 25.3% of AFF farm members thought they belonged to the Alabama Farm Bureau in 1992. This group, American concludes, represented an "at risk" population for Defendants to the extent that, had these members known the truth, they might have left Defendants' organization or never have joined in the first place. Multiplying these percentages by the respective number of associate and farm members in each of the years 1990 through 1994 (the only years for which American obtained data) gives a total of approximately 286,791 "at risk" members. AFF and the Alfa Companies presumably would have liked to continue using the FARM BUREAU mark to eliminate the risk of losing these members. The amount that AFF and the Alfa Companies theoretically would have been willing to pay to eliminate the risk of losing these members is a way to measure the reasonable royalty figure.

As already explained, the $3.50 per member figure compensated American for the full panoply of products and services it provided as well as member-related expenses such as mailings, building operations, etc. These expenses can be calculated for each of the years 1990 through 1994 and approximate 18.1% of the full $3.50 figure, leaving a residual of approximately $2.87 to pay for all of the services and products American offered to its affiliates. Many of the services American offers cannot be precisely valued, making it virtually impossible to apportion a precise value to the mark itself. However, multiplying the $2.87 figure times the number of "at risk" members results in a monetary value in an amount ($823,090.00) that AFF and the Alfa Companies stood at least some chance of losing without use of the mark. This, then, is a reasonable estimate of the amount that

AFF and the Alfa Companies would have been willing to pay for use of the FARM BUREAU mark.

Defendants contend that this figure is too high for many reasons. Two among these are (1) many, if not all, of the approximately 55,000 "at risk" members for each year would have chosen to remain with AFF had they known the truth and thus should not be counted, and (2) the $2.87 figure represents the value of all the benefits of affiliation and thus a lower figure should have been used. These objections are unconvincing because the reasonable royalty figure is simply a reasonable "estimate" not subject to exact mathematical precision. Since "[t]he most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of uncertainty which his own wrong has created," *Bigelow v. RKO Radio Pictures, Inc.,* 327 U.S. 251, 265, 66 S.Ct. 574, 580, 90 L.Ed. 652 (1946), the court considers these uncertainties to be to the Defendants' detriment.[14] Also, taking all members into account, the reasonable royalty figure amounts to a cost of only $0.48 per member annually, a small portion of the $3.50 figure, and significantly less than the fee other state Farm Bureaus charge in sublicense agreements for use of the mark.

It is impossible to put an exact figure on the value to the Defendants of the use of the FARM BUREAU mark in violation of the law. The Defendants obviously considered this use to be of great value to them. The court is simply attempting to arrive at a reasonable amount, based upon all the evidence, which the Defendants should have been willing to pay to American for use of the mark. The court finds that the $823,090.00 amount is a reasonable measure of the royalty AFF and the Alfa Companies owe American.

b. *Corrective Advertising Damages*

The court also finds that American is entitled to money damages for corrective advertising. The evidence established that the Defendants' misuse of the FARM BUREAU mark caused considerable confusion.

---

14. In addition, this estimate might be low in some respects. For example, while Defendants' infringing uses spanned more than a decade, this estimate considers only five years of infringement because this is the only data American provided at trial.

At the time of the Kennedy survey in 1992, roughly 50,000 to 70,000 members mistakenly thought they were members of the Alabama Farm Bureau. By the time of the Kitchens survey in 1995, approximately 249,602 Alabamians said they had insurance with Farm Bureau when in reality only about 11,300 of them did. The court infers from this that, in 1995, around 238,302 Alabamians thought they had Farm Bureau insurance when they actually had Alfa insurance.

Thus, from 1992 to 1995 the number of confused AFF members increased fairly dramatically. Had the Defendants not infringed upon American's mark by using the telephone cross-references, brochures associating Alfa with Alabama Farm Bureau without also disavowing a current affiliation, and television and radio ads with the same effect, this confusion would have declined as the old Farm Bureau faded from memory and Alfa promoted its new organization. The court therefore attributes the increase in confusion to the Defendants' continued misleading uses of the FARM BUREAU mark.

Having found that Defendants' misleading uses of the FARM BUREAU mark actually caused confusion, the question remains as to the amount of damages necessary to make American whole. In *Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co.*, 561 F.2d 1365 (10th Cir.1977), the court recognized that corrective advertising damages were necessary to "counteract the public confusion resulting from [an infringer's] wrongful conduct." *Id.* at 1374. To hold otherwise, "would be to recognize that [the trademark owner] has a right to the exclusive use of its trademark but has no remedy to be put in the position it was in ... before [the infringer] effectively usurped [the owner's] mark." *Id.* at 1374–75. The court measured the corrective advertising award by first assessing the amount spent by the infringer to publicly misuse the mark, followed by a 75% reduction in accordance with the Federal Trade Commission's rule in false advertising cases. In reducing the award by 75%, the court stated, "[W]e agree with [the FTC's] determination that a dollar-for-dollar expenditure for corrective advertising is un-

necessary to dispel the effects of confusing and misleading advertising." *Id.*

This court agrees with the reasoning and methodology employed by the Tenth Circuit in the *Big O Tire Dealers* decision. The evidence before the court established that Defendants spent $169,552.00 on telephone directories, $7,890 on television, and $200,000 on brochures, for a total expenditure of $377,442. Reducing this award by 75% yields a corrective advertising award due American of $94,360.50.

### c. *The Insurance Profits*

 A deliberate or willful trademark infringer can be required to turn over the profits he earns during the period of infringement subject to the discretion of the district judge and in light of the equities of the case. 15 U.S.C. § 1117. *See, e.g., Maltina Corp. v. Cawy Bottling Co. Inc.*, 613 F.2d 582 (5th Cir.1980). The accounting for profits is proper based upon a theory of unjust enrichment. *Id.* at 585. The Lanham Act requires only that the infringer have acted deliberately or purposely, for "[w]hether he believed himself to be within the law or not, he was knowingly and deliberately cashing in upon the good will of [the registrant]." *Burger King Corp. v. Mason*, 855 F.2d 779, 781 (11th Cir.1988) (quoting *Wolfe v. National Lead Co.*, 272 F.2d 867 (9th Cir.1959), *overruled in part on other grounds, Maier Brewing Co. v. Fleischmann Distilling Corp.*, 359 F.2d 156, 165 (9th Cir.1966)); *See also, Ambrit v. Kraft Inc.*, 6 U.S.P.Q.2d 1235, 1236–37, 1988 WL 281566 (M.D.Fla.1988) (noting that "in the context of the Lanham Act, as opposed to the federal criminal law, the term 'willfulness' does not necessarily require a finding that the defendant ... intended to "steal" plaintiff's trademark ...," but only that "the infringement was not accidental.")

 Moreover, a court may award all profits made during the infringing period, unless the infringer can prove that at least some of these profits flow from his own merit rather than from infringement of the registrant's mark. In interpreting the accounting-of-profits language of section 19 of the Trade–Mark Act of 1905, substantially identical to that of the succeeding Lanham Act, the

1552

Supreme Court of the United States refused to place the burden of apportionment on the plaintiff:

> If it can be shown that the infringement had no relation to profits made by the defendant, that some purchasers bought goods bearing the infringing mark because of the defendant's recommendation or his reputation or for any reason other than a response to the diffused appeal of the plaintiff's symbol, the burden of showing this is upon the poacher. The plaintiff of course is not entitled to profits demonstrably not attributable to the unlawful use of his mark.... There may well be a windfall to the trade-mark owner where it is impossible to isolate profits which are attributable to the use of the infringing mark. But to hold otherwise would give the windfall to the wrongdoer.

*Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.*, 316 U.S. 203, 206–07, 62 S.Ct. 1022, 1024–25, 86 L.Ed. 1381 (1942). Nevertheless, a district court must remember that the Lanham Act allows judgment for a sum the court deems "just" according to the circumstances of the case. 15 U.S.C. § 1117.

■ As explained previously, the court finds that the Defendants, with the exception of ELECT, intentionally infringed upon American's rights to the FARM BUREAU mark. American is therefore entitled to the profits the Alfa Companies earned because of this infringement. Although the evidence showed that during the time in question Alfa's profits were considerable,[15] the court finds that apportionment between profits attributable to the Alfa Companies' merit and those attributable to infringement is virtually impossible. The evidence sustains a finding that the Alfa Companies made a considerable profit during the infringing period, however, and the court would be within its discretion under the Lanham Act in awarding American all of these profits. Nevertheless, in the exercise of its discretion, the court finds that such an award would be unjust. The court chooses to award American 20% of the rea-

sonable royalty figure, or $164,618.00, an amount the court deems a reasonable return on the reasonable royalty that AFF and the Alfa Companies would have paid, and an amount well within the profits they made during the infringing period.

#### d. Trebling of Damages

■ The court may, in its discretion, enhance the resulting award up to three times the amount of damages as justice shall require. 15 U.S.C. § 1117(a). Such an award may not be punitive and must be based on a showing of actual harm. *Babbit,* 38 F.3d at 1183.

The monetary award to American, consisting of awards for a reasonable royalty, corrective advertising, and profits, amounts to $1,082,068.50. The court will not increase this amount, because any increase would be unjust and punitive in the circumstances of this case.

#### e. Attorney Fees

■ American seeks attorneys' fees under the Lanham Act's provision that "(t)he court in exceptional cases may award reasonable attorneys' fees to the prevailing party." 15 U.S.C.A. § 1117 (West Supp.1996). An award of attorneys' fees is at the discretion of the lower court and should be made only in exceptional circumstances and on evidence of fraud or bad faith. *Safeway Stores, Inc. v. Safeway Discount Drugs, Inc.,* 675 F.2d 1160, 1169 (11th Cir.1982).

■ The court finds that AFF and the Alfa Companies acted in bad faith in refusing to cease their infringing uses of the FARM BUREAU mark. The Defendants chose to disaffiliate with American with full knowledge that this meant giving up the "Farm Bureau" name; yet they continued to use the name in the years that followed with absolute disregard and indifference to American's rights in the mark. After American finally resorted to suing AFF and the Contracting Defendants, and after several years of litigation that followed in this court, AFF and the Contracting Defendants finally agreed on the

---

**15.** With respect to profits attributable to infringement, not only did the Alfa Companies obtain insurance profits from customers who were con-fused by the misleading uses of the FARM BUREAU mark, but also investment profits flowing from these insurance profits.

eve of trial to quit using the FARM BUREAU mark. American would soon learn, however, that AFF and the Contracting Defendants would not keep this promise.

Instead of honoring their legal and personal obligations under the Settlement Agreement, AFF and the Contracting Defendants, and later the Alfa Companies, continued to use the FARM BUREAU mark at their leisure despite American's continual protestations. Each time American discovered another misuse of the mark and reported it, the Defendants' pattern response was the same: counsel for the Defendants (with the approval of the Alfa Companies' General Counsel) would respond that the use was "trivial" or "vestigial," promise to discontinue the use, refuse American's request that Defendants investigate for further unknown misuses, and assure American that investigation was unnecessary since all steps to eradicate misuse of the mark had been taken. At the time of these assurances, the Alfa Companies' General Counsel knew of other existing misuses of the FARM BUREAU mark and plans for new misuses.

This is not merely a case of knowing and deliberate infringement of a trademark. It is a case of such infringement in total disregard of a specific promise to refrain from using the mark "in any manner." This was bad faith, and the court finds that the circumstances of this case clearly qualify as exceptional.

For all of these reasons, the court finds that American should not have to pay the attorney fees and expenses necessary to enforce its rights to the FARM BUREAU mark against the intransigent Defendants.

### 2. *The Total Monetary Award and Relief Under the Remaining Counts*

The court will not add to the monetary award of $1,082,068.50 already determined under the Lanham Act count. This monetary award adequately compensates American and provides strong deterrence to further infringement, removing the need for consideration of punitive damages under the state law claim. AFF and the Alfa Companies are jointly and severally liable for this entire amount; no money damages will be recovered from ELECT.

### 3. *Injunctive Relief Under the Lanham Act*

█ As stated by the Ninth Circuit, "[i]njunctive relief is the remedy of choice for trademark and unfair competition cases, since there is no adequate remedy at law for the injury caused by a defendant's continuing infringement." *Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1180 (9th Cir.1988). Section 34(a) of the Lanham Act, 15 U.S.C. § 1116, specifically grants the court broad discretion to fashion an injunction "according to the principles of equity and upon such terms as the court may deem reasonable...." The court finds that American is entitled to injunctive relief as follows:

(1) AFF and the Alfa Companies shall prevent the new publication of any cross-references between them, their subsidiaries and related companies and Farm Bureau in any telephone directories published in Alabama, Mississippi and Georgia;

(2) AFF and the Alfa Companies shall eradicate any remaining directory assistance cross-references between them, their subsidiaries and related companies and Farm Bureau within 30 days from this date;

(3) AFF and the Alfa Companies shall destroy within 30 days from this date any and all of the brochures described herein, except for file copies necessarily kept for historical reference and which are not made publicly available;

(4) To the extent that it may not have already done so, ELECT shall change its FEC registration listing to delete any reference to "Farm Bureau;"

(5) The Defendants shall refrain from stating that they were founded or historically affiliated with Farm Bureau unless they also clearly indicate that they no longer have any connection with Farm Bureau.

(6) The Defendants, their agents, employees, representatives and related companies shall not make in any manner whatsoever any statement or representation, or perform any act, likely to lead members of the public to believe that Defendants are in any manner, directly or indirectly, associated, affiliated, connected with, licensed, sponsored, au-

thorized or approved by Farm Bureau or American. Defendants shall conduct a thorough investigation to determine whether such confusing uses of the FARM BUREAU mark exist. If found, such uses of the mark shall be destroyed or otherwise permanently removed from public view.

### 4. *Specific Enforcement of the Settlement Agreement*

Alabama law holds that "[e]quity will decree the specific performance of a contract whenever it is made to appear that an action at law for damages would be an inadequate or impracticable remedy." *Gen. Sec. Corp. v. Welton,* 223 Ala. 299, 135 So. 329, 331 (1931). Money damages for breach of contract are both inadequate and impracticable here. As the estimation of a reasonable royalty made clear, it is difficult if not impossible to precisely value the right to absolute control of the mark. Other damages are difficult to measure as well: American's lost revenues attributable to the misleading directory cross-references in Georgia and Mississippi, where American's affiliates sold insurance; and the amount of advertising necessary to dispel confusion caused by the trademark infringement. Because of the difficulty of quantifying all of American's loss, the legal remedy for breach of contract is inadequate, and American is entitled to specific performance of the Settlement Agreement as relief under this claim.

Accordingly, the court will enter a separate order as follows:

(1) The Contracting Defendants cannot place the FARM BUREAU mark, or any abbreviation, word, or symbol representing the mark, in the public view. The Contracting Defendants shall order their affiliated and related companies to remove the same from public view;

(2) The Contracting Defendants shall disaffiliate any county organization that continues to place the FARM BUREAU mark in the public view.

### IV. CONCLUSION

All disputes between the parties concerning use of the Farm Bureau name in Alabama should have been settled once and for all by the Settlement Agreement entered into in 1986. Its terms were clear and unambiguous. If AFF and the Alfa Companies later felt that some uses of the name, such as telephone cross-references, brochures, etc., should be permitted in spite of the Settlement Agreement, good faith would have suggested that they discuss this with American to prevent any misunderstanding. Instead, they elected to act unilaterally and without consultation, using the mark in a manner helpful to their business and in complete disregard to the rights of American, which had accepted their promises at face value. In doing so, they violated both the Settlement Agreement and the Lanham Act. They are liable to American for damages, for specific performance of the Settlement Agreement, for injunctive relief, and for attorney fees and expenses that should not have been necessary had they simply kept their promises.

A separate order and judgment will be entered in accordance with this Memorandum Opinion.

### ORDER AND JUDGMENT

In accordance with the Memorandum Opinion entered on this day in this cause, JUDGMENT is hereby rendered in favor of the plaintiff and against the defendants and it is ORDERED as follows:

#### Damages

The plaintiff, American Farm Bureau Federation, shall have and recover of the defendants, Alabama Farmers Federation, Alfa Life Insurance Corporation, Alfa Mutual Insurance Company, Alfa Mutual Fire Insurance Company, Alfa Mutual General Insurance Company, Alfa Insurance Corporation, and Alfa General Insurance Corporation, the sum of One Million Eighty–Two Thousand Sixty–Eight Dollars and Fifty Cents ($1,082,-068.50), for which let execution issue.

#### Attorneys' Fees and Expenses

The plaintiff, American Farm Bureau Federation, shall have and recover of the defendants, Alabama Farmers Federation, Alfa Life Insurance Corporation, Alfa Mutual In-

surance Company, Alfa Mutual Fire Insurance Company, Alfa Mutual General Insurance Company, Alfa Insurance Corporation, and Alfa General Insurance Corporation, its reasonable attorneys' fees and expenses necessarily incurred in the prosecution of this action. The parties are given until September 13, 1996, to attempt to reach an agreement in this regard and to file notice advising the court that this matter has been settled. If the parties are unable to reach an agreement, the plaintiff is given until September 20, 1996, to file its claim for attorneys' fees and expenses. These defendants are given until September 27, 1996, to respond and the plaintiff may file a reply by October 4, 1996. The matter will be taken under submission for determination at that time.

## Injunction

The defendants, Alabama Farmers Federation, ELECT—The Political Action Committee of the Alabama Farmers Federation, Alfa Life Insurance Corporation, Alfa Mutual Insurance Company, Alfa Mutual Fire Insurance Company, Alfa Mutual General Insurance Company, Alfa Insurance Corporation, and Alfa General Insurance Corporation, are strictly injoined as follows:

(1) They (not to include ELECT) shall prevent the new publication of any cross-references between them, their subsidiaries and related companies and Farm Bureau in any telephone directories published in Alabama, Mississippi and Georgia;

(2) They (not to include ELECT) shall eradicate any remaining directory assistance cross-references between them, their subsidiaries and related companies and Farm Bureau within 30 days from this date;

(3) They (not to include ELECT) shall destroy within 30 days from this date any and all of the brochures described herein, except for file copies necessarily kept for historical reference and which are not made publicly available;

(4) To the extent that it may not have already done so, ELECT shall change its FEC registration listing to delete any reference to "Farm Bureau;"

(5) They shall refrain from stating that they were founded or historically affiliated with Farm Bureau unless they also clearly indicate that they no longer have any connection with Farm Bureau; and

(6) They, their agents, employees, representatives and related companies shall not make in any manner whatsoever any statement or representation, or perform any act, likely to lead members of the public to believe that they are in any manner, directly or indirectly, associated, affiliated, connected with, licensed, sponsored, authorized or approved by Farm Bureau or American. They shall conduct a thorough investigation to determine whether such confusing uses of the FARM BUREAU mark exist. If found, such uses of the mark shall be destroyed or otherwise permanently removed from public view.

## Specific Performance

Alabama Farmers Federation, Alfa Mutual Insurance Company, and Alfa Mutual Fire Insurance Company, as successors to the contracting parties, Alabama Farm Bureau Federation, Alabama Farm Bureau Mutual Casualty Insurance Company, Inc., and Alabama Farm Bureau Mutual Insurance Service, Inc., respectively, shall specifically perform their obligations under the Settlement Agreement as follows:

(1) They shall not place the FARM BUREAU mark, or any abbreviation, word or symbol representing the mark, in the public view; and they shall order their affiliated and related companies to remove the same from public view;

(2) Alabama Farmers Federation shall promptly disaffiliate any county organization that continues to place the FARM BUREAU mark in the public view.

## Costs

Costs are hereby taxed against the defendants, for which execution may issue.