**RAMADA FRANCHISE SYSTEMS, INC., a Delaware corporation, Plaintiff,**

v.

**Gene BOYCHUK, an individual; and BSB Inns, Ltd., a New York Corporation, Defendants.**

**No. 1:01–CV–1331.**

United States District Court, N.D. New York.

Sept. 17, 2003.

Hinman Straub, P.C., Albany, NY, James Potter, of Counsel, Attorneys for Plaintiff.

Pitney, Hardin, Kipp & Szuch LLP, Morristown, NJ, Dennis LaFiura, Richard Ballot, of Counsel, Attorneys for Plaintiff.

Cendant Corporation, Parsippany, NJ, Marcus Banks, of Counsel, Corporation Counsel.

Bartlett, Pontiff, Stewart & Rhodes, Glens Falls, NY, Benjamin Pratt, Eileen Haynes, of Counsel, Attorneys for Defendants.

### MEMORANDUM–DECISION and ORDER

HURD, District Judge.

## I. INTRODUCTION

Plaintiff Ramada Franchise Systems, Inc. ("RFS") brought suit against defendants Gene Boychuk ("Boychuk") and BSB Inns, Ltd. ("BSB"), alleging the following six causes of action: *First*—trademark infringement and trade dress infringement in violation of the Lanham Act, 15 U.S.C. §§ 1114(1)(a), 1125(a) and (c); *Second*—failure to account for revenue derived as a result of services rendered by RFS, in breach of a license agreement; *Third*—failure to pay liquidated damages in breach of a license agreement; *Fourth*—as an alternative to the liquidated damages claim, failure to pay actual damages for the premature termination of a license agreement; *Fifth*—failure to remit Recurring Fees in breach of a license agreement; and *Sixth*—unjust enrichment from the unauthorized operation of a facility using RFS' marks, dress, and name.

Defendants respond that: (1) with respect to the *First* cause of action, the Lanham Act was indeed violated, but Boychuk is not liable for RFS's loss, and BSB's responsibility is only partial; (2) with respect to the *Second, Third, Fourth,* and *Fifth* causes of action, neither Boychuk nor BSB was a party to any license agreement with RFS, and cannot therefore be liable for its breach; and (3) with respect to the *Sixth* cause of action, no benefit conferred by RFS was unjustly retained by either defendant.

The matter came on for a one-day bench trial on April 15, 2003, in Utica, New York. Testifying for RFS was James Darby ("Darby"), Vice President of Franchise Administration for RFS. Testifying for defendants were Boychuk and BSB's former general manager, Erik Ghirarduzzi. Decision was reserved. RFS and defendants submitted proposed findings of fact and conclusions of law both before and after trial. (Docket Nos. 25, 29, 41, 42.) The following are the Findings of Fact and Conclusions of Law pursuant to Fed. R.Civ.P. 52.

## II. FINDINGS OF FACT

Boychuk was a practicing medical doctor from 1960 until his retirement in August of 2001. (Court's Exh. 1, ¶ 4.) In the early 1970s, he was asked by his brother, George Boychuk ("George"), to invest in some business ventures in Lake George, New York. (Docket No. 38, Trial Transcript at 122) (hereinafter "Tr. at ____.") Boychuk gave his assent, and the two "went ahead and purchased four and a half acres of land on Route 9 in Lake George." *Id.* A short time later, George selected and negotiated the purchase of the thirty-eight acres of land abutting the land already acquired, with the intention of developing a shopping strip. *Id.* George, however, feeling that greater benefits would inure if a hotel was constructed and operated on the premises, convinced his brother to abandon the idea of developing a shopping strip, and conducted research on potential franchisers for the venture. *Id.* at 124. George made the decision to seek a fran-

chise from RFS.[1] *Id.*

George alone negotiated with RFS. *Id.* at 125. On October 16, 1973, a twenty-year license agreement was signed with Ramada Inns, Inc., the predecessor in interest to RFS. (Pl. Exh. 1; Court's Exh. 1, ¶ 20.) On the front page of the agreement, listed as "LICENSEE" is "George I. Boychuk or corporation to be formed," and the agreement is signed by George Boychuk as licensee. (Pl.Exh. 1.) Though a 1983 letter from George's attorney to RFS refers to Boychuk as a licensee, (Pl.Exh. 36),[2] there is no evidence from the 1970s or 1980s wherein RFS itself makes such a reference, despite Boychuk's belief that he was a licensee from the license agreement's inception. (Tr. at 146–48.)

In order to minimize individual liability, and in accordance with the license agreement, Boychuk and George, along with Richard Singer ("Singer"), formed BSB to manage and run the day to day operations of the hotel. (Court's Exh. 1, ¶¶ 8, 10, 36; Pl. Exh. 8, ¶ 3.4; Tr. at 125–26.) As Singer, in the 1980s, could no longer contribute any capital to the venture, he was bought out by the brothers, who thereafter each owned approximately a one-half interest in BSB.[3] (Tr. at 126.) Prior to his death in 1998, George operated and supervised the daily activities of the hotel, and acted as the "de facto president" of BSB. (Court's Exhibit 1, ¶ 11.)

In 1992, the term of the license agreement was extended to April 1, 1997. (Pl. Exh. 3; Court's Exh. 1, ¶ 21.) Similar to the original 1973 agreement, the amended agreement listed only "George I. Boychuk" as "Licensee." (Pl.Exh. 3.) The phrase "or corporation to be formed," which was present in the 1973 agreement, was absent from the amended agreement. Again, the amended agreement was signed only by George. *Id.* Though one letter from RFS was addressed to both George and Boychuk at the Lake George hotel address, (Pl.Exh. 4),[4] no documentary evidence was submitted wherein RFS referred explicitly to Boychuk as a licensee. In fact, another letter from RFS's compliance division was addressed only to George, (Pl.Exh. 5), and, as the end of the term of the amended agreement drew near, letters were sent from RFS solely to George, indicating RFS's desire to renew the agreement, (Pl. Exh. 6) and outlining renewal terms, (Pl. Exh. 7.)

The license agreement was then renewed on April 2, 1997, for a fifteen-year term. (Pl. Exh. 8; Court's Exh. 1, ¶¶ 22, 24.) Incident to the license agreement, a franchise application was filled out and turned into RFS. (Pl.Exh. 52.) The application, apparently completed and signed

1. RFS is owned by Cendant Corporation, which in addition to RFS owns eight other hotel franchise systems. (Tr. at 50.) RFS is a widely known provider of guest lodging facilities, and its marks and logos are nationally famous. (Court's Exhibit 1, ¶¶ 13, 19.) RFS, rather than owning and operating hotels, franchises the Ramada marks and logos to its 900 franchisees, also offering franchisees marketing and promotional services. (Tr. at 50; Court's Exhibit 1, ¶ 18.)

2. It appears the franchise had financial problems from the onsent. The letter was written in response to a notice George had received from Ramada terminating the franchise for various defaults and past due fees.

3. At that point, George himself actually owned 5/12 of BSB. His wife owned 1/12, and Boychuk owned the other half. (Court's Exhibit 1, ¶ 9.)

4. In addition to perpetual financial woes, the franchise quickly developed a poor record in terms of quality. This letter, dated September 27, 1995, and another, dated April 26, 1996, were both notices to cure quality assurance inspection failures. (Pl. Exhs. 4 and 5.)

by then general manager Peter Timeles ("Timeles"), identified BSB as the corporation applicant. *Id.* However, only George submitted the required financial statement, (*id.;* Tr. at 105), and the renewal agreement itself identified only "**GEORGE I. BOYCHUK, a sole proprietor,**" as the licensee, (Pl.Exh. 8) (emphasis and capitalization in original.) Similar to the prior versions, the renewal agreement was signed only by George. (*Id.;* Court's Exh. 1, ¶ 23.) In the opening paragraph, the agreement states that the licensee will also be referred to in the agreement as "you." (*Id.;* Appendix A.) On the signature page of the agreement, immediately after the phrase "**YOU, as licensee:**" is a printed version of "**GEORGE I. BOYCHUK.**" *Id.* (emphasis and capitalization in original). Underneath the printed name the word "BY" is followed by a colon and George's signature. *Id.* Underneath the signature again is George's printed name and the word "Owner." *Id.* The renewal agreement provides that the license is personal to the licensee and that RFS must approve any transfer, which would require a new franchise application and financial statement. (*Id.* at § 9.1; Tr. at 106.) On the same day the renewal agreement was signed, a "RESERVATION SOFTWARE LICENSE AGREEMENT" was signed in a manner identical to that of the renewal agreement. (Pl.Exh. 9.)

RFS was responsible for drafting the license agreement. (Tr. at 114.) According to Darby, George was designated as a sole proprietor in conformity with company practice to list individual owners as licensees. *Id.* at 115. Darby testified that if it were a partnership, the agreement would reflect that fact, and if it were three or four people not parties to a partnership, the agreement would name as licensees all individuals. *Id.* If there was a business form comprised of Boychuk and George, Darby claims the agreement would contain both their names. *Id.* at 116.

Per the renewal agreement, the licensee was required to pay a fifteen thousand dollar initial fee, which was paid by BSB. (Pl. Exh. 10; Pl. Exh. 8, § 6; Tr. at 108.) The licensee was required to submit to quality assurance inspections, (Pl.Exh. 8, §§ 3.8, 4.8), which were usually conducted once or twice a year, though it is possible no inspections will be conducted for a period of time if the hotel has had problems and is making efforts to improve and retain the franchise, (Tr. at 76, 98.) The licensee was also required to submit to RFS monthly reports dealing with performance-based matters, and to submit financial records when so requested. (Pl. Exh. 8, § 3.9.) In turn, RFS was required to provide a myriad of services to the licensee, including training, marketing, participation in a central reservation system, and listing in promotional directories. (Pl. Exh. 8, § 4; Tr. at 60–64.)

To support the services provided by RFS all franchisees are required to pay a Ramada Inns National Association fee ("RINA fee").[5] (Tr. at 60–64; Pl. Exh. 8, § 7.1.2.) The RINA fee, paid monthly, was equivalent to 4.5% of the licensee's "Gross Room Revenues"[6] for a given month, (Pl.

---

5.  The services partially or wholly paid for by the RINA fee are: 1) internet technical support; 2) listing in a national directory provided to all hotels and city or town welcome centers; 3) franchise services, including training workshops aimed at customer service or revenue enhancement; 4) regional marketing services; and 5) maintenance of the central reservation system. (Tr. at 60–64.)

6.  "Gross Room Revenue" is, simply put, the monthly revenue per available room at the hotel. To arrive at a figure, the gross room revenue for the entire hotel is divided by the number of rental units within it. (Tr. at 73.)

Exh. 8, Schedule C), and is part of what has been referred to by the agreement and the parties as "Recurring Fees." Also part of the Recurring Fees was a required monthly payment equivalent to 4% of the licensee's monthly "Gross Room Revenues." *Id.* at § 7.1.1. If a franchisee failed to pay Recurring Fees, and failed to rectify the situation within thirty days of receiving written notice of the default or received two or more default notices in any one year, RFS was entitled to terminate the license agreement. (Pl. Exh. 8, §§ 11.1–11.2; Court's Exh. 1, ¶ 31.) The agreement provided for liquidated damages in the event of a premature termination. (Pl.Exh. 8, § 12.)

After the renewal agreement was signed, the financial and quality-based troubles of the franchise continued. Timeles was repeatedly reminded throughout 1994 that the franchise had "guest satisfaction" issues and owed RFS money. (Pl. Exh. 53, Franchise Services Notes, entries dated 02/01/1994, 05/16/1994, 06/03/1994, 09/30/1994, 12/29/1994.) By March 24, 1995, though still apparently struggling with quality assurance obligations, the franchise was current on its Recurring Fees. *Id.*, entry dated 03/24/1995. By 1996, however, quality assurance problems had resurfaced and financial obligations again became past due, eventually resulting in the restriction of the hotel's placement on the reservation system. *Id.*, entry dated 03/24/1997. A few months later, on June 25, 1997, the quality assurance default had been apparently cured, but the franchise was still in breach of its monetary obligation to RFS. *Id.*, entry dated 06/25/1997. A letter dated April 16, 1998, was sent from RFS to

George giving notice that Recurring Fees were owed in the amount of $38,146.41, and that the franchise was in continuing default of its quality assurance obligations.[7] (Pl.Exh. 13.)

Some months later, on September 26, 1998, a couple of weeks after the latest quality assurance inspection, Boychuk's brother George passed away. (Court's Exh. 1, ¶ 11.)[8] No transfer request was ever filed by George, Boychuk, or BSB, and Boychuk never submitted a financial statement. (Tr. at 107.) Just prior to George's death, a suggestion was made that the running of the hotel be left to George's daughter. (Tr. at 129.) Boychuk, wary of his niece's lack of experience, told the family members that the hotel should be operated by himself or George's wife. *Id.* When George's wife failed to respond to his suggestion, Boychuk "explained to them that naturally the running will be and control will be by [him]." *Id.*

Around the time of George's funeral, Boychuk visited the hotel. *Id.* at 130. While there, he came to learn that his brother had not been following their agreement that any money that he contributed to the franchise was to be matched by George. *Id.* at 128, 130. Boychuk returned to the hotel two weeks later, in order to introduce himself to hotel employees as the person who will be "oversee[ing] the general running of the place." *Id.* at 131. He again noted the financial mismanagement that had plagued the hotel. *Id.* In the meantime, on October 26, 1998, as a result of continued monetary defaults, the franchise was taken off RFS's central res-

---

7. Quality assurance inspections were conducted at the hotel on October 21, 1997, and February 27, 1998. (Pl.Exhs.11, 12.)

8. RFS, as noted *supra,* continued to address correspondence to George for years after his death and for years after it undoubtedly had knowledge of his demise.

ervation system. (Pl. Exh. 53, Compliance Notes, entry dated 10/26/98.)

In November, Boychuk again visited the hotel and found its management to be "horrible." (Tr. at 132.)[9] He informed Timeles that measures needed to be taken to improve the operation of the hotel. (*Id.;* Court's Exh. 1, ¶ 41.) Upon returning to the hotel three weeks later, he determined the proper measures had not been taken, prompting him to begin the search for a new general manager. (Tr. at 132–33.) Meanwhile, with its continued monetary and quality assurance defaults, the hotel was kept off the central reservation system. (Pl. Exh. 53, entries dated 01/14/1999 and 03/15/1999.) By letter dated April 7, 1999, addressed to the now deceased George, RFS gave notice of the franchise's continuing monetary default, which at that point was in the amount of $35,639.04. (Pl.Exh. 15.) George's nephew, the representative of his estate, was thereafter in negotiations with RFS regarding the unpaid fees; Boychuk became aware of these negotiations after his attorney contacted the nephew. (Tr. at 140–41.)

Knowing that RFS was entitled to the Recurring Fees and not wanting to lose the franchise, which he believed was valuable, on May 20, 1999, Boychuk signed a "Monetary Settlement Agreement," which outlined a schedule for payment of the franchise's Recurring Fees delinquency. (Tr. at 166–67; Pl. Exh. 16; Court's Exh. 1, ¶ 52.) Some time in July of 1999,[10] Boychuk also signed software and hardware agreements. (Pl.Exhs.17, 18.) On both of these agreements, in the upper left corner, in the space designated for "Entity," Boychuk crossed out his brother's name and printed his own. *Id.* Also on both agreements, on the signature page, no name or words appear after the word "LICENSEE." *Id.* Instead, Boychuk's signature appears on the line below, after the word "BY." *Id.* At the time he signed the agreements, Boychuk was under the impression he was a licensee. (Tr. at 146–49.) He neither sought nor received input or authority from his brother's estate before signing the software, hardware, or monetary settlement agreements. *Id.* at 160–61.

In the summer of 1999, Boychuk, without consulting his brother's estate representative, *id.* at 157, fired Timeles and hired a new general manager, Erik Ghirarduzzi ("Ghirarduzzi"), to run the day to day operations of the hotel, (*Id.* at 133, 197, 199; Court's Exh. 1, ¶ 42.) Up until Ghirarduzzi's hiring, Boychuk had been visiting the hotel approximately once a month, spending a weekend there for each visit. (Tr. at 133.) For the first month after Ghirarduzzi assumed his position, Boychuk kept in close communication with him by phone; thereafter, the frequency of phone communication was reduced to once per week, and he visited the hotel approximately once every two months. *Id.* at 134.

Ghirarduzzi found the hotel to be run down and in poor shape financially. *Id.* at 199. Prior to his arrival, the financial records of the hotel were largely limited to the filing of tax returns. *Id.* There were

9. Boychuk summed up the problems the hotel had by providing an example of what he encountered upon arriving at the hotel late on a Friday night in November. As he neared or entered the kitchen, he saw a figure hurriedly run away, "and all of a sudden a whole pork loin dropped on the floor, and [he] realized that there is a problem." (Tr. at 132.)

10. The agreements are not dated. However, RFS received the signed agreements on July 21, 1999, or shortly prior thereto. (Pl. Exh. 53, Compliance Notes, entry dated 07/21/1999.)

no profit and loss statements generated, and expenses had gone untracked. *Id.* At no time prior to or after Ghirarduzzi assumed the general manager position did the hotel's income ever exceed its expenses. *Id.* at 199–200.

According to Ghirarduzzi, his job was to do "[a]nything and everything that needed to be done to make sure the hotel r[an] smoothly." *Id.* at 200. This involved supervising the personnel and day to day operations of the hotel, and handling the hiring and firing of department heads. *Id.* The hotel had a staff of approximately twenty-five to thirty during the winter, and fifty to fifty-five during the summer. *Id.* at 201. Early in his tenure, the staff at the hotel was reduced by 80%. *Id.* Ghirarduzzi himself fired the head chef, or any other department head that he determined needed to be terminated, and let the retained department supervisors handle the hiring and firing of their own lower-level employees. *Id.* The only employee fired by Boychuk was Timeles, and the only employee hired by him was Ghirarduzzi. *Id.* at 201–02, 134–35, 157. Ghirarduzzi was aware of the fees arrearage, and knew that RFS was entitled to the same. (Court's Exh. 1, ¶ 44.)

The hotel's financial situation remained poor throughout 1999, during which it suffered a net income loss of $61,153.88. (Def. Exh. 5; Tr. at 143, 200; Pl. Exh. 49.) Ghirarduzzi, making a management decision, decided not to pay RFS the Recurring Fees it was owed, opting instead to pay the bills needed to keep the hotel open and functioning property, such as electric bills and employee salaries. (Tr. at 203–04.) No money was paid to RFS from August of 1999 forward. (Court's Exh. 1, ¶ 45; Tr. at 230.) In accordance with the license agreement, RFS permanently removed the hotel from its central reservation system in October of 1999. (Court's

Exh. 1, ¶ 54; Pl. Exh. 16, § 11.4; Tr. at 66.) If a potential guest called the reservation system's 1–800 number, a message informed the guest that no rooms were available, even though the hotel may indeed have had vacancies. (Tr. at 92.) The removal did not reduce RFS's cost in operating the system. *Id.* at 66. Despite the removal from the central reservation system, the hotel continued to receive marketing and other support programs and services funded by the RINA fee, with the exception of listing in the national directories. *Id.* at 68, 233. The hotel also continued, without objection, to take calls from the franchise services division of RFS, and continued to receive quality assurance inspections. *Id.* at 77, 232.

In January of 2000, after the first quality assurance inspection since George's death, RFS sent a letter to George, who had now been deceased for roughly fourteen and a half months, notifying him of the franchise's failure to submit monthly reports for August through September of 1999, and that Recurring Fees in the amount of $42,442.92 were due and owing. (Pl. Exhs. 19, 20; Court's Exh. 1, ¶ 55.) Two weeks later, RFS sent another letter addressed to George, enclosing copies of the software and hardware agreements that Boychuk had signed months earlier. (Pl.Exh. 21.) A few months later, in April of 2000, RFS became aware that George had died. (Pl. Exh. 53, Compliance Notes, entry dated 04/12/2000; Tr. at 86.) Ordinarily, if a licensee dies, an effort is made to enter into a new agreement or eradicate any deficiencies in an older agreement— RFS made no such effort in this case. (Tr. at 87.)

On June 1, 2000, the Warren County Supreme Court, in response to a foreclosure action begun as a result of the nonpayment of a mortgage, which had been personally guaranteed by both Boychuk

and his brother, appointed a receiver, Howard Krantz ("Krantz"). (Def. Exh. 1; Court's Exh. 1, ¶ 46.) Ghirarduzzi did not become aware of the receiver's appointment until the day Krantz walked into the hotel. (Tr. at 206.) The day to day operations of the hotel remained within the control of Ghirarduzzi, and though Krantz was ultimately responsible for determining which bills to pay, he by and large followed Ghirarduzzi's recommendations. *Id.* at 207, 231. The receiver participated in hiring and firing only to the extent that it impacted the finances of the operation. *Id.* at 208. Boychuk was not consulted about which bills to pay, or which people to retain, neither in person nor by telephone. *Id.* at 207–08, 145. No Recurring Fees were paid during the period of receivership, which ended on July 15, 2001. (Court's Exh. 1, ¶¶ 47–48; Def. Exh. 3.)

On July 6, 2000, a quality assurance inspection was conducted at the hotel. (Pl. Exh. 22.) Nearly two weeks later, an RFS representative learned from Ghirarduzzi that "there was indeed a surviving partner although he was not named on the license agreement." (Pl. Exh. 53, Compliance Notes, entry dated 07/18/2000.) On October 27, 2000,[11] yet another quality assurance inspection was conducted at the hotel. (Pl. Exh. 23; Court's Exh. 1, ¶ 57.) Shortly thereafter, a letter from RFS, again addressed to George, served as notice of the franchise's continuing quality assurance default. (Pl. Exh. 25; Court's Exh. 1, ¶ 58.) The letter warned that if the quality assurance default was not cured within thirty days, a quality assurance default

would be added to the monetary default on the central reservation system restriction, and service thereto would not be reinstated until both defaults had been cured. (*Id.;* Pl. Exh. 53, Compliance notes, entry dated 11/02/2000.)[12] While counsel for Boychuk wrote a letter to the receiver in September of 2000, requesting that Krantz make efforts to maintain the franchise and satisfy the outstanding Recurring fees, (Def.Exh. 4), no letters or other correspondence referring to Boychuk as a licensee were sent by or addressed to him during the year 2000.

On January 12, 2001, another quality assurance inspection was performed at the hotel. (Pl. Exh. 26; Court's Exh. 1, ¶ 59.) Just over two weeks later, yet another notice of the hotel's continued quality assurance default was sent. (Pl. Exh. 28; Court's Exh. 1, ¶ 59; Pl. Exh. 53, Compliance notes, entry dated 01/29/2001.) The notice was again addressed to George only. (Pl.Exh. 28.) A few months later, an RFS representative followed up on the quality assurance default, inquiring as to what steps were being taken to remedy the hotel's continued default. (Pl. Exh. 53, Franchise Services notes, entry dated 05/17/2001.)

On May 24, 2001, RFS sent a letter, again addressed to the deceased George, advising that it was terminating the license agreement. (Pl. Exh. 29; Pl. Exh. 53, Compliance notes, entry dated 05/24/2001.) The letter referred to a January of 2000 letter in which the dead George had pur-

---

**11.** Also in October of 2000, RFS brought suit against Boychuk and George's estate in New Jersey state court, seeking payment of the unpaid Recurring Fees. (Court's Exh. 1, ¶ 62.) Boychuk was dismissed for lack of personal jurisdiction, but BSB was joined as a defendant. *Id.* As of the date of trial in the instant case, RFS had a motion for a default judgment pending in the New Jersey action, *id.,*

though it had obtained a consent judgment against George's estate in the amount of $486,702.20, (Def.Exh. 1.)

**12.** The financial situation of the hotel continued to deteriorate throughout 2000, at the end of which the hotel had a net income of -$113,087.51. (Def. Exh. 6; Pl. Exh. 50.)

portedly been advised of the financial default. (Pl.Exh. 29.) Cited also were the hotel's failure to submit monthly reports, a default dating back to July of 1999, the failure to submit Recurring Fees, and the continued quality assurance default. *Id.* The letter directed the "Licensee" to "de[-]identify the [hotel] from its appearance as a Ramada guest lodging facility" and to "discontinue further use of the Ramada tradename and service marks on or about the [hotel], including any form of advertising to promote the [hotel] as a Ramada System [hotel]." *Id.* The "Licensee" was also directed to remove all items hotel items bearing Ramada marks or logos, and to change all signs, billboards, and listing in directories in which the hotel is identified as a Ramada hotel. *Id.* In addition to demanding payment of liquidated damages in the amount of $192,000 for the "premature" termination of the license agreement, the letter estimated the Recurring Fees to be in default in the amount of $224,745.73, *id.*, though this figure was modified by stipulation to $156,752.93, not including interest, (Court's Exh. 1, ¶ 66.)

Ghirarduzzi received the termination letter at the hotel, read it, and forwarded it to an attorney's office. (Tr. at 205; Court's Exh. 1, ¶ 61.) He never discussed the letter with Boychuk. *Id.* A couple of months later, however, Boychuk was aware that something was amiss. Ghirarduzzi had mentioned to him that he had been in contact with RFS. (Tr. at 142.) Boychuk felt that he should become involved, so he called the President of RFS. *Id.* The President spoke briefly to Boychuk, but despite an assurance to the contrary, Boychuk was never called by any RFS representative thereafter. *Id.* In the meantime, in late summer of 2001, receiver Krantz was discharged. (Def.Exh. 3.)

Despite the termination letter, the hotel did not de-identify or cease using the Ramada marks or logos on its goods, signs, or advertising materials.[13] (Court's Exh. 1, ¶ 43.) On August 24, 2001, RFS filed the complaint in the instant case. (Docket No. 1; Court's Exh. 1, ¶ 63.) On January 15, 2002, RFS's motion for a preliminary injunction was granted, and defendants were ordered to cease the use of Ramada trade names, service marks, and logos, and to refrain from marketing, promoting, or renting guest lodging facilities in such a manner that the origin of the hotel's goods and services was designated as being those of RFS, or in such a manner that is confusingly similar to RFS. (Docket No. 13.) In compliance with the order, defendants de-identified the hotel on January 23, 2002. (Court's Exh. 1, ¶ 54; Pl. Exh. 34.) Despite the use of Ramada marks, dresses, and services, no Recurring Fees were paid to RFS from August of 1999 to the date of de-identification. (Court's Exh. 1, ¶ 65.)

## III. CONCLUSIONS OF LAW

### A. Lanham Act (First cause of action)

RFS claims in its *First* cause of action that "defendants violated the Lanham Act by virtue of their unauthorized use of registered marks (Section 32), their false designation as to the origin of their hotel services (Section 43(a)), and the consequent dilution of the Ramada marks (Section 43(c))." (Docket No. 27, p. 27; Docket No. 1, ¶¶ 45–55.) "The key issue in [claims under Sections 32 and 43(a)] is whether an appreciable number of consum-

---

**13.** Nor did the hotel apparently bother to cure any of its quality assurance problems, as evidenced by the litany of guest complaints dating from the summer of 2001 to early 2002. (Pl.Exhs.30, 31, 33.) This could be due to the hotel's continuing state of financial instability; for the third straight year, it suffered a negative net income. (Def.Exh. 7.)

ers are likely to be misled or confused as to the source of the product in question." *Nikon Inc. v. Ikon Corp.*, 987 F.2d 91, 94 (2d Cir.1993). When determining whether a likelihood of confusion exists, the Second Circuit looks to the following non-exhaustive, non-exclusive factors first laid out in *Polaroid Corp. v. Polarad Elec. Corp.*, 287 F.2d 492, 495 (2d Cir.1961):(1) the strength of plaintiff's mark; (2) the degree of similarity between plaintiff's and defendant's mark; (3) the proximity of plaintiff's and defendant's products; (4) the likelihood that defendant will use plaintiff's trademark to "bridge the gap" in proximity by using the mark for products closer to plaintiff's area of commerce; (5) the sophistication of the buyers or potential buyers of the products; (6) the quality of defendant's product; (7) actual confusion; and (8) whether defendant acted in good or bad faith. *TCPIP Holding Co. v. Haar Communications Inc.*, 244 F.3d 88, 100 (2d Cir.2001). While demonstrating a likelihood of confusion is not imperative for a claim under Section 43(c), many of the same factors are utilized. *See Federal Express Corp. v. Federal Espresso, Inc.*, 201 F.3d 168, 175–77 (2d Cir.2000).

■ Though the parties did not brief the merits of the Lanham Act claims, as defendants apparently admit the statute was violated, there is no dispute that the actions of the hotel, in continuing to use the Ramada marks and trade dress after the May 24, 2001, termination letter, violated the Lanham Act. The mark used by the hotel was not just similar to the Ramada mark—it was the Ramada mark. The Ramada mark is famous throughout the country, and customers at the hotel would undoubtedly have believed—given the presence of the Ramada sign and various products and equipment within the hotel bearing the Ramada mark—that the hotel was a Ramada hotel. There is no dispute that the hotel did not do justice to Ramada's reputation. Several customer complaints were received, and there is no indication that the hotel had any respectable period free from quality assurance defaults. These deficiencies, instead of being attributed to the hotel alone, were projected onto Ramada. The bad faith in using the marks will be discussed, *infra*. While there is no question the Lanham Act was violated, the parties do dispute whether and to what extent Boychuk and BSB are liable for such violations.

### 1. *Boychuk*

■ No evidence was presented at trial that Boychuk directly participated in the violations.[14] While liability for Lanham Act violations may extend beyond direct participants, *see Inwood Lab., Inc. v. Ives Lab.*, 456 U.S. 844, 854–55, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982), it will only do so where the corporate officer is proven to be "a moving, active conscious force" behind the corporation's infringement, *see Bambu Sales, Inc. v. Sultana Crackers, Inc.*, 683 F.Supp. 899, 913 (E.D.N.Y.1988) (internal quotations and citation omitted); *see also PGC Prop. v. Wainscott/Sagaponack Prop. Owners, Inc.*, 250 F.Supp.2d 136, 144 (S.D.N.Y.2003); *Procter & Gamble Co. v. Quality King Distrib., Inc.*, 123 F.Supp.2d 108, 117 (E.D.N.Y.2000); *Monsanto Co. v. Haskel Trading, Inc.*, 13 F.Supp.2d 349, 354 (E.D.N.Y.1998).

14. It is well established that a corporate officer directly participating in a Lanham Act violation will be held liable for damages. *See West Indian Sea Island Cotton Ass'n v. Threadtex, Inc.*, 761 F.Supp. 1041, 1054 (S.D.N.Y. 1991) (citing *Natl. Survival Game v. Skirmish,*

*U.S.A., Inc.*, 603 F.Supp. 339, 341 (S.D.N.Y. 1985)); *see also ASA Music Prod. v. Thomsun Elec.*, No. 96 Civ 1872, 1998 WL 988195 (S.D.N.Y. Sep. 29, 1998); *U.S. Media Corp. v. Edde Entm't, Inc.*, Civ. No. 4849, 1996 WL 520901 (S.D.N.Y. Sep.12, 1996).

Boychuk, though a corporate officer of BSB, was not the moving, active conscious force behind the hotel's Lanham Act violations. He was not involved in the day-to-day decisionmaking process or operations of the hotel. Specifically, while he was aware of the Recurring Fees delinquency, he had no control over the hotel's marketing or promotional practices. He was not personally involved in any negotiations with RFS, and was only aware of the same through secondary channels. He was simply an investor. The only person ever hired by him was Ghirarduzzi. Ghirarduzzi made the decision not to pay the Recurring Fees, and was ultimately the influencing factor in whether Krantz decided to pay such fees during receivership. There was insufficient evidence to demonstrate Boychuk engaged in the level and scope of activity needed to hold him liable for the Lanham Act violations.

### 2. *BSB*

█ BSB, on the other hand, is liable for the violations. Through Ghirarduzzi, its general manager, BSB directly participated in the Lanham Act violations. Ghirarduzzi ran the day-to-day operations of the hotel, participated and made decisions as to marketing and promotional activities, and specifically decided which bills to pay. He had complete authority over any removal of RFS's marks and dresses from hotel property and signs, and, despite being fully aware of the termination letter, he continued to permit the infringing activities to occur.

BSB, while conceding some liability for the Lanham Act violations, argues that it should escape responsibility for violations occurring during the period of receivership. Such an argument not only ignores the practical realities of the arrangement with Krantz, but also misinterprets the legal standards governing Lanham Act lia-

bility. While Krantz was ultimately responsible for making financial decisions, including whether to pay RFS for the use of its marks and dresses, these decisions were largely influenced by Ghirarduzzi. Ghirarduzzi would recommend which bills to pay, and Krantz by and large followed those recommendations.

In any event, that the receiver was handling certain financial aspects of the hotel is irrelevant to whether BSB is liable for the Lanham Act violations. The issue is not whether BSB could have paid for the use of the marks and dresses, which, incidentally, Ghirarduzzi never recommended. The license agreement was already terminated. Therefore, any use, whether paid for or not, was unauthorized. There is no evidence that the appointment of the receiver resulted in Ghirarduzzi losing control over the day-to-day operations of the hotel. In fact, Krantz specifically left such operations to Ghirarduzzi's discretion. Operating the hotel includes making marketing and promotional decisions, and conversing with RFS about the same. Ghirarduzzi was aware that RFS had terminated the license agreement, yet he decided, as the ultimate authority of the hotel, to continue to use its marks and dresses without permission or consent. Thus, while Boychuk, as a far removed corporate officer involved almost exclusively in only investing in the hotel, is not responsible for the hotel's infringing activities, BSB is liable for the entire time period in which the Lanham Act was violated.

### 3. *Actual damages*

█ The period of infringement was May 24, 2001, the date RFS terminated the license agreement, to January 23, 2002, the date on which the infringing use ceased. Defendants admit that RFS is entitled to payment for the period of time

in which the marks and dresses were used without permission or payment. RFS contends that the amount of damages incurred during this time is $66,713, "the Recurring Fees that would have been paid to RFS under the terms of the License Agreement, during the period of infringement[.]" (Docket No. 29, ¶ 97). RFS's proposed measure of damages is adequate and well supported.

Under 15 U.S.C. § 1117(a), a prevailing plaintiff is entitled to recover its actually sustained damages. "One way courts measure how much damage a defendant has caused a plaintiff by infringing the plaintiff's mark is by determining what royalty the plaintiff would have received for a license." *N.Y. Racing Ass'n, Inc. v. Stroup News Agency Corp.,* 920 F.Supp. 295, 302 (N.D.N.Y.1996); *see also Sands, Taylor & Wood v. Quaker Oats Co.,* 34 F.3d 1340, 1350 (7th Cir.1994) (stating that "the district court ought to begin with the one measure of actual damages that, if ascertained with reasonable certainty, could be said to reflect the actual loss of [plaintiff]—the cost of a reasonable royalty."); *Ramada Inns, Inc. v. Gadsden Hotel Co.,* 804 F.2d 1562, 1565 (11th Cir.1986) ("Royalties normally received for the use of a mark are the proper measure of damages for misuse of those marks.") (internal quotations and citation omitted). Using lost royalties as the proper measure of damages "recognizes that, separate from the more traditional damages such as lost sales or declining reputation, trademark infringement deprives the mark's owner of the economic benefit of controlling and licensing the right to use the mark." *American Farm Bureau Fed'n v. Alabama Farmers Fed'n,* 935 F.Supp. 1533, 1549 (M.D.Ala.1996). "In effect, the court assumes the existence *ab initio* of, and declares the equitable terms of, a supposititious license, and does this *nunc pro tunc;* it creates and applies retroactively a compulsory license ....'" *Id.* (quoting *Univ. Computing Co. v. Lykes–Youngstown Corp.,* 504 F.2d 518, 537 (5 th Cir.1974)).

The royalties awarded are limited to those that would have been received during the period of infringement. *See, e.g., Four Seasons Hotels and Resorts B.V. v. Consorcio Barr, S.A.,* 267 F.Supp.2d 1268, 1331 (S.D.Fla.2003); *Davis v. McDonald's Corp.,* 44 F.Supp.2d 1251, 1263 (N.D.Fla. 1998); *KFC Corp. v. Lilleoren,* 821 F.Supp. 1191, 1193 (W.D.Ky.1993); *I Can't Believe It's Yogurt v. Gunn,* No. Civ.A. 94–OK–2109–TL, available at 1997 WL 599391, at *17 (D.Colo. Apr.15, 1997). While it is permissible to estimate the royalties using hypotheticals, *American Farm,* 935 F.Supp. at 1549 (quoting *Univ. Computing Co.,* 504 F.2d at 537), a more concrete calculation may be used where, as here, the parties had in place a license agreement providing for the payment of royalties, *see A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.,* 166 F.3d 197, 209 (3d Cir.1999).

In the instant case, the license agreement provided for a monthly recurring fees payment of 8.5% of the hotel's gross room revenues. It has been stipulated that the hotel earned gross room revenue in the amount of $784,862 during the period of infringement. (Court's Exh. 1, ¶ 67.) The simple calculation results in a Recurring Fees payment of $66,713.27. This amount represents RFS's actual damages and is in no way punitive to BSB.

Defendants argue that the 4.5% portion of the royalties representing the RINA fee should be excluded from the damages award because the hotel was taken off the central reservation system. However, the testimony at trial established that the fee paid in whole or part for a variety of services offered to licensees, not just the maintenance and operation of the central

reservation system. Therefore, RFS's damages against BSB for the Lanham Act violations is the amount of royalties it would have received during the infringing period, which again the evidence has demonstrated to be $66,713.27.

### 4. Treble damages

■ Per 15 U.S.C. § 1117(a), it is within the district court's discretion to "enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount." RFS claims it is entitled to a trebling of its actual damages because of the "malicious, fraudulent, willful, and deliberate" nature of the infringement. (Docket No. 42, § 160; Docket No. 29, § 98.) The statute makes clear that an enhancement of actual damages must be for "compensation[,] and not a penalty." *Id.* The question presented, therefore, is whether an enhancement for malicious, fraudulent, willful, and deliberate infringement can be classified in this case as compensatory and not penal. A decision by the Second Circuit, faced with determining whether a party that had "willfully, intentionally and with a callous and reckless disregard" infringed on another party's trademark was subject to a punitive damages award under Section 1117, *Getty Petroleum Corp. v. Bartco Petroleum Corp.*, 858 F.2d 103, 105 (2d Cir. 1988), sheds light on the question.

After determining that the plain language of the statute did not allow a punitive damages award, the court in *Getty Petroleum* concluded that the legislative history of the Lanham Act and its predecessor, the Trademark Act of 1905, revealed that the enhancement provision was inserted into Section 1117 because of the difficulty of proving actual damages. *Id.* at 110–11. Any enhancement was to take a remedial character, and punitive damages were therefore unavailable. The Fifth Circuit has agreed:

> It is anomalous to say that an enhancement of damages, which implies an award exceeding the amount found "compensatory," must be "compensatory" and not "punitive." Responding to that anomaly, we have suggested that enhancement could, consistent with the "principles of equity" promoted in [Section 1117], provide proper redress to an otherwise under compensated plaintiff where imprecise damage calculations fail to do justice, particularly where the imprecision results from defendant's conduct.

*Taco Cabana Int'l, Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1127 (5th Cir.1991).

Here, there is no evidence that the $66,713.27 awarded to RFS as actual damages is in any way inadequate as compensation for the infringement. The figure was determined from a specific formula—8.5% of the hotel's monthly gross room revenue—taken from the license agreement drafted by RFS and utilized at its urging for the damages calculation. Thus, this is not a situation where there is no evidentiary basis for actual damages, or where the amount so awarded was speculative. *See Bowmar Instrument Corp. v. Continental Microsystems, Inc.*, 497 F.Supp. 947, 961 (S.D.N.Y.1980). RFS neither claims nor proves that the actual damages award they suggest does not compensate them for their injury.

RFS has offered no non-punitive reasons for the enhancement. Enhancing the damages award for the purposes of deterrence is inapplicable, as the hotel has de-identified and there is no reason to believe it will again infringe on RFS's marks. We are thus left with only the descriptors themselves. It should be noted that the descriptor "willful" was rejected as a basis for the enhancement by the court in *Getty Petroleum*, as was "deliberate," to the ex-

tent that such a term can be deemed equivalent to "intentional." Again, the Second Circuit in *Getty Petroleum* rejected the argument that punitive damages are available as an enhancement to actual damages, and at least two of the descriptors used by RFS arguably fall under or smack of a punitive damages standard.[15]

Therefore, even assuming the infringing conduct was "malicious, fraudulent, willful, and deliberate," there is simply no compensatory, non-punitive basis for enhancing the actual damages awarded to RFS. While the court in *Taco Cabana* did indicate that willful infringement may justify an enhancement, restraint is still imposed by the Second Circuit's admonition that compensation must be the basis for the enhancement, and even the Fifth Circuit recognized that enhancement based on willful conduct must not be punitive in nature. The actual damages award of $66,713.27 represents adequate compensation to RFS for the infringement by BSB.

### 5. *Attorney's fees*

■ RFS also seeks attorney's fees under the Lanham Act. Section 1117(a) provides that "[t]he court in exceptional cases may award reasonable attorney's fees to the prevailing party." The Second Circuit has defined an "exceptional case" as one involving "fraud or bad faith ... or willful infringement." *Patsy's Brand, Inc. v. I.O.B. Realty, Inc.*, 317 F.3d 209, 221 (2d Cir.2003) (internal quotations and citations omitted). Therefore, the descriptors of the infringing conduct used by RFS—"malicious, fraudulent, willful, and deliberate"—while not particularly helpful in the treble damages inquiry, retain relevance in the attorney's fees context, and need a determination as to applicability.

There is sufficient evidence that the infringing conduct fits the descriptors used by RFS. BSB, through Ghirarduzzi, received the termination letter, which demanded that the hotel stop using any Ramada mark. Ghirarduzzi knew that the hotel had to pay for its use of the marks, and he had sufficient control to ensure that such use stopped. While the receiver, Krantz, may have had the final say with respect to paying the fees so as justify the use of the marks, he largely followed Ghi-

---

**15.** *See, e.g.,* 3 Fed. Jury Prac. & Instr. § 123.40 (2000) (noting that punitive damages are available in fraud cases for *"maliciously"* performed acts); 3 Fed. Jury Prac. & Instr. § 127.15 (2000) (noting that punitive damages are available in trade secret cases for acts performed *"willfully"* and *"maliciously"*); 3 Fed. Jury Prac. & Instr. § 128.81 (2000) (noting that punitive damages are available in personal injury cases for acts performed *"maliciously"*); 3 Fed. Jury Prac. & Instr. § 129.40 (2000) (noting that punitive damages are available in property/business injury cases for acts performed *"maliciously"*); 3A Fed. Jury Prac. & Instr. § 153.71 (2001) (noting that punitive damages are available for *"willful"* noncompliance with Fair Credit Reporting Act); 3B Fed. Jury Prac. & Instr. § 161.91 (2001) (permitting punitive damages award under RICO against a defendant that "acted with *malice* [or] *willfulness"*); 3B Fed. Jury Prac. & Instr. § 164.111 (2001) (permitting punitive damages award in bankruptcy discrimination cases for defendant's conduct that was *"malicious"*); 3C Fed. Jury Prac. & Instr. § 169.62 (2001) (noting that punitive damages are appropriate in housing discrimination cases where defendant acted with *"malice"*); 3C Fed. Jury Prac. & Instr. § 170.64 (2001) (noting that punitive damages are appropriate in racial discrimination cases where defendant acted with *"malice"*); 3C Fed. Jury Prac. & Instr. § 171.94 (2001) (noting that punitive damages are appropriate in employment discrimination cases where defendant acted with *"malice"*); 3C Fed. Jury Prac. & Instr. § 172.74 (2001) (noting that punitive damages are appropriate in disability discrimination cases where defendant acted with *"malice"*); 3C Fed. Jury Prac. & Instr. § 177.74 (2001) (noting that punitive damages are appropriate in sex discrimination cases where defendant acted with *"malice"*).

rarduzzi's recommendations, and, in any event, the mere use of the marks involved no financial decision. It was a simple matter of advertising, and the removal thereof. One would be strained to find that the continued, unauthorized use was not willful or deliberate.

Some credit is to be given to the notion that, after the termination letter was received, the hotel was in negotiations with RFS in an effort to keep the franchise. Once it was realized such negotiations were fruitless, and certainly once suit was filed in the instant case, any and all credit for that notion disappears. BSB has admitted that it knew that the use of the marks required payment to RFS. BSB has also candidly admitted that the Lanham Act was violated. If the infringing conduct was truly innocent, or in good faith, or of a non-willful and deliberate nature, the unauthorized use should have ceased once suit was filed. It did not. Therefore, because the infringement was knowing, willful, and deliberate, this case qualifies as "exceptional" and attorney's fees are appropriate under the Lanham Act.[16]

### B. Breach of license agreement (Second through Fifth causes of action)

There is no question that the terms of the license agreement were violated. Prior to the termination of the license, Recurring Fees of $156,752.93 were past due and owing. (Court's Exh. 1, ¶ 66.) The liquidated damages clause, assuming without deciding that it is enforceable, mandates a payment of $192,000. (Pl.Exh. 8, ¶ 12.1.) Quality assurance standards had not been

met, and the hotel had failed to make disclosures about its revenue. The issue with respect to the *Second, Third, Fourth,* and *Fifth* causes of action, therefore, is whether Boychuk and/or BSB are bound to the license agreement and responsible for the breaches. Though neither Boychuk nor BSB were signatories to the license agreement, RFS contends that both "engaged in conduct and in a course of performance, both before and after the death of [George], which objectively manifested their intent to be bound by the existing franchise relationship, and to continue that relationship consistent with the terms and benefits enjoyed by [George]—a contract implied in fact." (Docket No. 42, § 170.)

■■■■ "A contract implied in fact may result as an inference from the facts and circumstances of the case, although not formally stated in [oral or written] words, and is derived from the 'presumed' intention of the parties as indicated by their conduct." *Jemzura v. Jemzura,* 36 N.Y.2d 496, 503–04, 369 N.Y.S.2d 400, 408, 330 N.E.2d 414 (N.Y.1975) (internal citations omitted); *see also Robert S. Nusinov, Inc. v. Principal Mut. Life Ins. Co.,* 80 F.Supp.2d 101, 106 (W.D.N.Y.2000) ("Under New York law, in the absence of an express agreement, a contractual relationship may nonetheless be established by the conduct of the parties and the surrounding circumstances"). "An implied in fact contract is just as binding as an express contract arising from declared intention, since in the law there is no distinction between agreements made by words and those

---

16. Defendants claimed at trial, for apparently the first time, that the use could not be considered willful because Ghirarduzzi was relying on the advice of counsel in not removing the marks. When a defendant raises the advice of counsel defense, it is considered a waiver of the attorney-client privilege for the

advice so given, and discovery is permitted on the advice and related issues. *See, e.g.,* In re Buspirone Antitrust Litigation, 208 F.R.D. 516, 522 (S.D.N.Y.2002). Here, the defense was not raised in the pleadings or during discovery. Accordingly, it is deemed waived and unavailable at trial.

made by conduct." *Ellis v. Provident Life & Accident Ins. Co.,* 3 F.Supp.2d 399, 409 (S.D.N.Y.1998) (internal quotations and citation omitted).

### 1. *Boychuk*

■ With respect to Boychuk, there is ample evidence that he desired to be a licensee bound to the agreement. In fact, he thought he was just that from the inception of the agreement onward. He signed three documents on behalf of the hotel—settlement agreement regarding the fees, and hardware and software leases. He even attempted, upon finding out about the troubles with the Recurring Fees and the subsequent negotiations between RFS and BSB/George's estate, to contact RFS and offer help. However, like an express or oral contract, a contract implied in fact requires a meeting of the minds to all material and relevant terms. *See Nadel v. Play–By–Play Toys & Novelties, Inc.,* 208 F.3d 368, 375 n. 5 (2d Cir. 2003); *Express Indus., and Terminal Corp. v. N.Y. State Dep't of Transp.,* 93 N.Y.2d 584, 589, 693 N.Y.S.2d 857, 715 N.E.2d 1050 (N.Y.1999). "Mutual assent evincing the intention of the parties to form a contract is essential, and without it, a party may not be held to the contract." *Gomez v. Bicknell,* 756 N.Y.S.2d 209, 216, 302 A.D.2d 107 (2d Dep't 2002); *Ellis,* 3 F.Supp.2d at 409 ("The assent of the person to be charged is necessary, and, unless he has conducted himself in such a manner that his assent may fairly be inferred, he has not contracted") (internal quotations and citation omitted). Whether there was a meeting of the minds between the parties is a question of fact. *U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.,* 241 F.3d 135, 145 (2d Cir.2001). Where the facts are inconsistent with a finding that the parties mutually agreed to all relevant aspects, no contract will be implied. *See Lubeck Realty Inc. v. Flintkote*

*Co.,* 565 N.Y.S.2d 922, 924, 170 A.D.2d 800 (3d Dep't 1991).

While Boychuk considered himself a licensee, and bound to the license agreement, RFS did not consider him so. RFS sent to his home in Ohio no documents referring to him as a licensee, and none, save for one in 1995, during the decades-long relationship between RFS and the hotel, were addressed to his attention at the hotel address in Lake George. Boychuk voluntarily spoke with the President of RFS about the Recurring Fees situation, but he never received a call back or in any way participated in the negotiations to salvage the franchise. Despite his desires, RFS did not treat him as a licensee. He was an investor and officer of BSB.

RFS does point to some documentary evidence indicating direct contact between Boychuk and RFS, namely, a letter in 1983 and the three documents Boychuk signed. The 1983 letter did indeed refer to Boychuk as a licensee, but it was written by George's attorney, not by RFS, and there is no indication that any follow-up correspondence regarding the contents of the letter were sent to or discussed with Boychuk. The three documents signed by Boychuk also do not demonstrate that RFS agreed that Boychuk was a licensee. The credible testimony and evidence established that he signed those documents after they were sent by and at the urging of Ghirarduzzi. They were not sent to his home, or even to his attention at all. In fact, he had to cross out the name of his then deceased brother before signing. In addition, on the software and hardware agreements, no words filled the blank after the word "LICENSEE." Instead, Boychuk signed after the word "BY," which was located underneath "LICENSEE." Judging from all the other evidence and the correspondence and negotiations that followed the signing of those agreements,

including where such correspondence was sent and who participated in the negotiations, it is more reasonable to infer that RFS believed Boychuk to be signing in his corporate capacity, on behalf of the entity RFS knew managed the hotel.

In addition, after learning of George's death, RFS made no attempt to enter into a new agreement with Boychuk, despite testimony that it was the company's standard practice to do so. Instead, contact was made with BSB, and negotiations were undertaken not with Boychuk or even BSB, but with George's estate. It is much more reasonable to conclude that RFS believed George was the sole licensee, especially when his estate was the only chosen negotiating partner with respect to the license agreement, despite RFS's awareness of Boychuk. While Boychuk desired to be a licensee, there is insufficient evidence to give rise to the inference that RFS, until this litigation, ever believed he was a licensee, treated him as a licensee, accepted him as a licensee or claimed he was a licensee. Therefore, the terms of the license agreement are not binding upon him.

### 2. *BSB*

■■■ At first glance, the evidence and testimony seem to establish a contractual relationship between BSB and RFS. Before and after George's death, BSB continued to closely interact with RFS, and, for a while at least, fulfilled the obligations of the license agreement. It submitted reports and Recurring Fees, and both Ghirarduzzi and his successor had frequent, rather continuous contact with the franchise services and compliance departments at RFS. Interaction was also found with respect to improving the quality and earning capacity of the hotel. Further, all correspondence in the submitted evidence was sent to the hotel, out of which RFS presumably was aware that BSB was operating. Even though much of the correspondence was addressed to George, both before and after he died, the testimony and submitted evidence demonstrate that RFS's key contact point, and the person to whom they would go with all business and expense questions, including and especially those dealing with obligations under the license agreement, was the BSB general manager. If these alone constituted all of the relevant facts, BSB may well have been responsible for the obligations under the license agreement. *See Watts v. Columbia Artists Mgmt. Inc.*, 591 N.Y.S.2d 234, 236–37, 188 A.D.2d 799 (3d Dep't 1992) ("We are of the view that the parties' conduct after the expiration of the written contract, including defendant's continued rendition of services, plaintiff's acceptance of those services and plaintiff's payment of commissions in accordance with the terms of the written contract, clearly establish a contract implied in fact . . .").

However, simple reference to the license agreement itself precludes imposing such obligations on BSB. Specifically, paragraph 3.4 required the hotel to "be managed by either a management company or an individual manager with significant training and experience in general management of similar lodging facilities." (Pl. Exh. 8, ¶ 3.4.) The agreement does not state that such company or individual would also be considered a licensee. In fact, the following paragraph mandates that "You . . . *and* the [hotel's] general manager will attend the training programs described in Section 4.1 we designate as mandatory for licensees *or* general managers, respectively." *Id.* at ¶ 3.5 (emphasis added). Thus, it is clear that RFS intended there to be a distinction between the licensee, George, and the management company, BSB, the entity with which it would interact on matters relevant to the facility—it was the entity hired by the

licensee to run the hotel. Indeed, throughout the compliance and franchise services notes—which are written records of RFS's contacts with the hotel—the distinction is maintained by RFS's reference to Ghirarduzzi as the "GM." (Pl.Exh. 53.)

The parties' course of dealing does not change the conclusion. While BSB was undoubtedly the contact point for all matters regarding the hotel, any correspondence sent to make a record of the various breaches of the agreement was sent to George, the licensee. It appears the typical pattern involved phone calls to Ghirarduzzi to discuss and address the problems, followed by a letter to the licensee if the problem was not fixed. This is consistent with the notion that BSB was the management company and George was the licensee ultimately responsible.

That BSB prepared and submitted the franchise application is of no moment. The resulting license agreement, which is the subject of the breach of contract claims, was signed by "GEORGE I. BOYCHUK, a sole proprietor," (Pl.Exh. 8), not by BSB or any of its employees. A contract between BSB and RFS cannot be implied in fact.

### C. Unjust enrichment (Sixth cause of action)

In the alternative to its breach of contract claims, RFS asserts an unjust enrichment claim against BSB and Boychuk. To prevail on an unjust enrichment claim, RFS must demonstrate: "(1) that [BSB/Boychuk] was enriched; (2) that the enrichment was at [RFS's] expense; and (3) that the circumstances are such that in equity and good conscience [BSB/Boychuk] should return the money or property to [RFS]." *Golden Pacific Bancorp v. FDIC*, 273 F.3d 509, 519 (2d Cir.2001). There is no dispute that the hotel did not earn a profit, neither before nor after the license

agreement was terminated. The enrichment cited by RFS, however, is "the paydown of various debts." (Docket No. 42, ¶ 186.) Specifically, RFS claims that Boychuk "enjoyed the benefit of mortgage and property tax payments (for which he would have been personally liable) and ... the repayment of over $300,000 in loans to BSB, as well as payments to reimburse travel, legal, and family health insurance expenses, all during a period of time when RFS was not being paid for the use of the Ramada marks." *Id.* at ¶ 187.

Leaving aside the issue of whether the existence of the license agreement, which precisely governs that which RFS seeks under this claim, precludes this claim, none of the alleged benefits enjoyed by defendants are sufficiently tied to the unauthorized use of the Ramada marks. Boychuk neither participated in nor authorized the improper use of the Ramada marks. That he received payments for loans he had made to BSB, instead of RFS receiving due and owing Recurring Fees, does nothing to more closely tie him into the unauthorized use. That he received certain tax benefits as a result of BSB's annual losses in no way ties those benefits into the unauthorized use. In fact, such benefits are often the very reason corporate business forms are used, as are the benefits in the form of insurance and travel and legal expenses.

Perhaps the more compelling claim for unjust enrichment is against BSB. BSB was able to pay down loans to Boychuk at a time when it was not paying the Recurring Fees to RFS. However, RFS has not demonstrated to the degree that equity would so require in this situation that such payments are tied to the unauthorized use. The true beneficiary of RFS's services, to be sure, is the licensee. The licensee directly received the benefit of all the training programs, advertising,

and services RFS offers. The licensee used the marks. BSB was the management company acting on behalf of the licensee, and can hardly be considered enriched by the simple performance of its assigned tasks. These circumstances are not the type where equity demands some restitution, especially from an individual and an entity that received, at best, a benefit that was two or three times removed from the services rendered.

## IV. CONCLUSION

It is undisputed that the Lanham Act was violated, and the license agreement breached. The central inquiry presented by this bench trial, therefore, was whether Boychuk and/or BSB was responsible for these transgressions, and to what extent. Boychuk was not the moving force behind the Lanham Act violations, and cannot be held liable therefor. BSB did directly participate in the violations, and is liable therefor in the amount of $66,713.27. Boychuk, as a non-signatory to the license agreement, was not treated as a licensee by RFS, and cannot be liable for the breaches of the agreement. BSB was the company hired pursuant to the license agreement mandate, written by RFS, to manage the hotel. It, too, cannot be held liable for the breaches of the license agreement. Equity does not demand any restitution by either Boychuk or BSB on a theory of unjust enrichment. The licensee, or in this case, the licensee's estate, is the main party responsible for any losses suffered by RFS.

Accordingly, it is

ORDERED that

1. The *First* cause of action (Lanham Act) is:

a. DISMISSED as against defendant Gene Boychuk; and

b. In favor of plaintiff Ramada Franchise Systems, Inc. against defendant BSB Inns, Ltd. in the sum of $66,713.27, plus reasonable attorney's fees and expenses, without prejudgment interest; and

c. Treble damages pursuant to 15 U.S.C. § 1117(a) are DENIED;

2. The *Second, Third, Fourth, Fifth,* and *Sixth* causes of action are DISMISSED.

The plaintiff may file and serve a verified application for reasonable attorney's fees and expenses as related to the *First* cause of action, on or before October 3, 2003. The defendants may file and serve a verified response on or before October 17, 2003. The application will be taken on submit with a final judgment entered thereafter.

IT IS SO ORDERED.